**Case Nos. 17-70810, 17-70817**

**UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**

---

NATIONAL FAMILY FARM COALITION, ET AL.,
*Petitioners*,
v.
UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, et al.,
*Respondents*,
DOW AGROSCIENCES LLC,
*Respondent-Intervenor*.

---

NATURAL RESOURCES DEFENSE COUNCIL,
*Petitioner*,
v.
SCOTT PRUITT, ET AL.,
*Respondents*,
DOW AGROSCIENCES LLC,
*Respondent-Intervenor*.

---

On Petition for Review of an Order of the
United States Environmental Protection Agency

---

# BRIEF OF PETITIONER NATURAL RESOURCES DEFENSE COUNCIL

Margaret T. Hsieh
Mitchell S. Bernard
Kaitlin Morrison
Natural Resources Defense Council
40 West 20th Street
New York, NY 10011
Telephone: (212) 727-2700

Peter J. DeMarco
Natural Resources Defense Council
1152 15th Street NW
Suite 300
Washington, DC 20005
Telephone: (202) 289-6868

*Counsel for Petitioner Natural Resources Defense Council*

Dated: April 11, 2018

## CORPORATE DISCLOSURE STATEMENT
## REQUIRED BY FED. R. APP. P. 26.1

Petitioner Natural Resources Defense Council, Inc. (NRDC) is a non-profit corporation with no parent corporation and no outstanding stock shares or other securities in the hands of the public. NRDC does not have any parent, subsidiary, or affiliate that has issued stock shares or other securities to the public. No publicly held corporation owns any stock in NRDC.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT .......................................................i

TABLE OF AUTHORITIES ....................................................................iv

INTRODUCTION ..................................................................................1

STATEMENT OF JURISDICTION....................................................................4

ISSUES PRESENTED......................................................................................6

STATUTORY AND REGULATORY FRAMEWORK..........................................6

I. Unconditional pesticide registration.................................................7

II. Conditional pesticide registration......................................................8

STATEMENT OF THE CASE........................................................................10

I. Enlist Duo is a new pesticide combining 2,4-D and glyphosate that will increase 2,4-D use and bolster glyphosate use......................................10

II. Enlist Duo poses a significant risk to monarch butterflies...........................14

III. Enlist Duo may pose serious risks to human health.....................................22

IV. Procedural history...........................................................................23

A. EPA's previous registration orders (2014 and 2015)..........................23

B. EPA's current registration order (2017)............................................25

SUMMARY OF ARGUMENT ........................................................................30

STANDARD OF REVIEW ............................................................................33

ARGUMENT ....................................................................................................35

I. EPA's registration of Enlist Duo is unlawful because FIFRA does not authorize EPA to register a new pesticide under § 136a(c)(7)(B) ................35

A. EPA's registration of Enlist Duo contravenes the plain text of § 136a(c)(7)(B) ...........................................................35

B. EPA fails to provide a reasonable explanation that reconciles its registration of Enlist Duo with the plain text of § 136a(c)(7)(B) ...........................................................38

C. EPA's misguided approach to § 136a(c)(7)(B) undermines FIFRA's core purpose because it allows new pesticides on the market without adequate assessment of their risks ..................40

II. EPA's registration of Enlist Duo under § 136a(c)(7)(B) is not supported by substantial evidence because EPA failed adequately to consider increased risk of harm to monarch butterflies and human health ................43

A. EPA declined to assess harm to milkweed and monarchs from Enlist Duo's expansion of 2,4-D use.........................................44

B. EPA ignored evidence that registering Enlist Duo would result in increased glyphosate use over time and thereby amplify risks that glyphosate poses to both monarchs and humans.................47

III. NRDC has standing to challenge EPA's registration of Enlist Duo .............49

CONCLUSION ..............................................................................................52

STATEMENT OF RELATED CASES ..................................................................54

CERTIFICATE OF COMPLIANCE.....................................................................55

CERTIFICATE OF SERVICE ............................................................................56

ADDENDUM OF STATUTES AND REGULATIONS ...........................ADD 001

ADDENDUM OF DECLARATIONS IN SUPPORT OF STANDING.....ADD 049

## TABLE OF AUTHORITIES

CASES

*Benitez v. Califano*,
573 F.2d 653 (9th Cir. 1978) ....................................................................38

*Burlington Truck Lines v. United States*,
371 U.S. 156 (1962)..................................................................................34

*Cent. Delta Water Agency v. United States*,
306 F.3d 938 (9th Cir. 2002) ....................................................................51

*Containerfreight Corp. v. United States*,
752 F.2d 419 (9th Cir. 1985) ....................................................................33

*Cty. of Amador v. U.S. Dep't of Interior*,
872 F.3d 1012 (9th Cir. 2017) ..................................................................42

*Dilley v. Gunn*,
64 F.3d 1365 (9th Cir. 1995) ....................................................................49

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*,
528 U.S. 167 (2000)..................................................................................50

*Hunt v. Wash. State Apple Advert. Comm'n*,
432 U.S. 333 (1977)..............................................................................49, 50

*L.A. Lakers, Inc. v. Fed. Ins. Co.*,
869 F.3d 795 (9th Cir. 2017) ....................................................................35

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992)..............................................................................50, 51

*Ma v. Ashcroft*,
361 F.3d 553 (9th Cir. 2004) ....................................................................43

*Mont. Wilderness Ass'n v. McAllister*,
666 F.3d 549 (9th Cir. 2011) ...................................................34, 46, 47, 49

*Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983)....................................................................34, 46, 47, 49

*Nat'l Ass'n of Mfrs. v. Dep't of Def.*,
138 S. Ct. 617 (2018)..........................................................................37

*NRDC v. EPA* (*Nanosilver I*),
735 F.3d 873 (9th Cir. 2013) ..............................................33, 34, 39, 51

*NRDC v. EPA* (*Nanosilver II*),
857 F.3d 1030 (9th Cir. 2017) ............................................33, 34, 39, 48

*Nw. Coal. for Alternatives to Pesticides v. EPA*,
544 F.3d 1043 (9th Cir. 2008) ..............................................................7

*N.Y. State Pesticide Coal., Inc. v. Jorling*,
874 F.2d 115 (2d Cir. 1989) ................................................................42

*Pollinator Stewardship Council v. EPA*,
806 F.3d 520 (9th Cir. 2015) ....................................... 1, 7, 33-34, 34, 41, 46

*Sultan Chemists, Inc. v. EPA*,
281 F.3d 73 (3d Cir. 2002) ..............................................................40, 42

*Union Oil Co. of Cal. v. Fed. Power Comm'n*,
542 F.2d 1036 (9th Cir. 1976) ........................................................33, 46

*Util. Air Regulatory Grp. v. EPA*,
134 S. Ct. 2427 (2014)..........................................................................37

*United Farm Workers of Am., AFL-CIO v. Adm'r, EPA*,
592 F.3d 1080 (9th Cir. 2010) ..............................................................4

*Yith v. Nielsen*,
881 F.3d 1155 (9th Cir. 2018) ............................................................35

STATUTES AND REGULATIONS

7 U.S.C. § 136 ....................................................................................................36

7 U.S.C. § 136(a) ..................................................................................................7

7 U.S.C. § 136(bb) ........................................................................................1, 7, 40

7 U.S.C. § 136(t) ....................................................................................................6

7 U.S.C. § 136(u) ...................................................................................6, 7, 36, 38

7 U.S.C. § 136a(a)...........................................................................................6, 43

7 U.S.C. § 136a(c)(1)(F) .......................................................................................42

7 U.S.C. § 136a(c)(5) ..................................................................7, 26, 31, 41

7 U.S.C. § 136a(c)(5)(C).....................................................................7, 8, 28, 31

7 U.S.C. §136a(c)(5)(D) ..........................................................................7, 8, 31

7 U.S.C. § 136a(c)(7) .........................................................................................7, 8

7 U.S.C. § 136a(c)(7)(A) ..................................................................................26, 29

7 U.S.C. § 136a(c)(7)(B).....................................................................*passim*

7 U.S.C. § 136a(g) ..................................................................................................9

7 U.S.C. § 136n(b) .....................................................................................4, 5, 33

40 C.F.R. § 23.6 ......................................................................................................5

40 C.F.R. § 152.44 ..................................................................................................7

40 C.F.R. § 152.112(b) ...................................................... 7-8, 31, 41, 42

40 C.F.R. § 152.112(c)......................................................................................8, 31

40 C.F.R. § 152.112(e) .......... 7, 31

40 C.F.R. § 155.40 .......... 9

40 C.F.R. § 155.42 .......... 9

40 C.F.R. § 155.53(a) .......... 9

40 C.F.R. § 158.75 .......... 7, 31

## INTRODUCTION

Petitioner Natural Resources Defense Council (NRDC) challenges the unlawful order of Respondents Scott Pruitt and U.S. Environmental Protection Agency (together, EPA) registering Enlist Duo herbicide under the Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA). EPA's order violates FIFRA because the agency applied the wrong legal standard in registering Enlist Duo. In the alternative, the order contravenes that standard because EPA had "no real idea," *Pollinator Stewardship Council v. EPA*, 806 F.3d 520, 532 (9th Cir. 2015), of whether Enlist Duo will "significantly increase the risk of any unreasonable adverse effect" on human health or the environment, 7 U.S.C. § 136a(c)(7)(B); *see id.* § 136(bb). Of particular concern, EPA failed to consider Enlist Duo's potential to destroy crucial monarch butterfly habitat, and ignored recent science on the herbicide's human health risks.

Enlist Duo threatens the vulnerable remnant of North American monarch butterflies. The monarch butterfly, *Danaus plexippus*, is an iconic species famed for its annual migration across the continent. But the migrating population of butterflies has declined precipitously in recent years. This decline has been driven in large part by the sharply increasing use of herbicides enabled by herbicide-resistant crops, which has decimated milkweed, the sole food source for monarch caterpillars. In 1997, nearly 700 million monarchs journeyed from summer habitat

in the United States and Canada to wintering grounds in Mexico. That number has fallen by over 80 percent. A 2014 survey found only about 25 million butterflies—a record low—in their winter refuge. Scientists warn that the monarch population faces a significant risk of collapse within the next twenty years.

Enlist Duo is a new herbicide that combines the active ingredients 2,4-dichlorophenoxyacetic acid (2,4-D) and glyphosate. Both 2,4-D and glyphosate kill the milkweed that sustains the monarch migration. Enlist Duo is designed for use on corn, soybeans, and cotton that have been engineered to resist 2,4-D and glyphosate. This allows more Enlist Duo to be sprayed on the crops to kill weeds, without damaging the crops themselves. Registration of the herbicide will significantly increase overall 2,4-D use and bolster glyphosate use. Although NRDC requested that EPA evaluate Enlist Duo's potential to harm monarchs by destroying milkweed, EPA evaded the issue and registered the herbicide for use in thirty-four states squarely within the butterflies' migration path.

The agency also ignored NRDC's request to fully evaluate the effects of glyphosate on human health. Over the past decade, scientists have published a significant number of peer-reviewed studies on glyphosate's health risks, including research suggesting that glyphosate may cause serious harms such as kidney toxicity and birth defects. Despite troubling questions that the recent studies raise

about glyphosate's safety to humans, EPA declined to review much of this new science prior to registering Enlist Duo.

EPA may not rely on 7 U.S.C. § 136a(c)(7)(B), the FIFRA standard under which the agency unlawfully chose to register Enlist Duo, to justify its failure to evaluate critical evidence of the herbicide's risks. Section 136a(c)(7)(B) narrowly authorizes EPA to "amend" previously approved registrations. But Enlist Duo is a new herbicide without any preexisting registration to amend; consequently, EPA may not register Enlist Duo under that provision. To circumvent this limitation, EPA treated the application to register Enlist Duo as if it were simply an application to amend a prior registration of 2,4-D. But § 136a(c)(7)(B) provides no basis for transmuting an amended registration for 2,4-D into a brand-new registration for Enlist Duo. This approach violates the plain statutory text.

In the alternative, even if EPA may register the new uses of Enlist Duo under § 136a(c)(7)(B) in defiance of the unambiguous statutory language, the registration is not supported by substantial evidence. The agency failed to make the mandatory showing that Enlist Duo would not "significantly increase the risk of any unreasonable adverse effect on the environment," because it ignored evidence of amplified risks to monarchs from milkweed destruction, and of extended risks to human health. 7 U.S.C. § 136a(c)(7)(B). EPA's registration of Enlist Duo therefore violates FIFRA and should be vacated.

## STATEMENT OF JURISDICTION

This Court has jurisdiction under FIFRA, which provides for review in the courts of appeals of "any order issued by the Administrator following a public hearing." 7 U.S.C. § 136n(b). NRDC is challenging EPA's final order registering Enlist Duo for use in thirty-four states. ER 1-36. The order followed a public hearing because EPA solicited and reviewed public comments before issuing the order. *See United Farm Workers of Am., AFL-CIO v. Adm'r, EPA*, 592 F.3d 1080, 1082-84 (9th Cir. 2010).

NRDC may bring this action because it was "a party to the proceedings" before EPA and is "adversely affected" by EPA's order registering Enlist Duo. 7 U.S.C. § 136n(b). NRDC participated in the agency proceedings by timely submitting comments opposing the proposed registration. ER 144-211. In its comments, NRDC asserted that EPA cannot lawfully register Enlist Duo without adequately assessing potential adverse effects on monarch butterflies and human health. ER 146-51, 158-78.

NRDC and its members are adversely affected by EPA's registration of Enlist Duo.[1] NRDC has members who live in agricultural regions in states where EPA approved the use of Enlist Duo, and EPA's action increases the risk that these

---

[1] As discussed further below, these adverse effects give NRDC standing to challenge the registration order. *See infra* Argument III.

members will suffer health harms from exposure to the herbicide. *See* Bristol Decl. ¶¶ 2-8 (ADD 051-53); Gruber Decl. ¶¶ 3-9 (ADD 058-61); Wetzel Decl. ¶¶ 3-9, 15 (ADD 069-72, 074).[2] Registration of Enlist Duo also injures NRDC's members who derive aesthetic and recreational enjoyment from watching and interacting with monarchs, because Enlist Duo kills milkweed and hence exacerbates monarch decline. *See* Bristol Decl. ¶¶ 10-14 (ADD 053-54); Gruber Decl. ¶¶ 10-12 (ADD 061); Wetzel Decl. ¶¶ 10-15 (ADD 072-74).

Finally, NRDC's petition is timely and venue is proper in this Court because NRDC filed the petition "in the United States court of appeals for the circuit wherein [NRDC] resides or has a place of business, within 60 days after the entry of [the challenged] order." 7 U.S.C. § 136n(b). EPA's final order registering Enlist Duo for use in thirty-four states was signed on January 12, 2017, and entered fourteen days later, on January 26, 2017. *See* 40 C.F.R. § 23.6; Case No. 17-70817, ECF No. 22-1, at 1-2. NRDC filed a petition for review challenging that order on March 21, 2017. *See* ER 1; Case No. 17-70817, ECF No. 1-5. Venue is proper because NRDC has offices within the Ninth Circuit, in San Francisco and Santa Monica, California, and in Bozeman, Montana. Trujillo Decl. ¶ 4 (ADD 065).

[2] "ADD" indicates the page number in the addendum of standing declarations bound with this brief.

## ISSUES PRESENTED

**I.** Did EPA violate FIFRA by registering Enlist Duo—a new pesticide—under § 136a(c)(7)(B), which authorizes the agency only to "amend the registration of a pesticide to permit additional uses of such pesticide"? 7 U.S.C. § 136a(c)(7)(B).

**II.** In the alternative, even if EPA may register the inaugural uses of Enlist Duo under § 136a(c)(7)(B), did the agency lack substantial evidence to conclude that the herbicide would not "significantly increase the risk of any unreasonable adverse effect on the environment," *id.*, because it failed to consider the registration's potential to destroy additional monarch butterfly habitat and to extend risk to human health?

## STATUTORY AND REGULATORY FRAMEWORK

Under FIFRA, any pesticide must be "registered" by EPA before it can be sold or distributed in the United States. 7 U.S.C. § 136a(a). A "pesticide" includes "any substance or mixture of substances intended for preventing, destroying, repelling, or mitigating any pest," *id.* § 136(u), including any "weed," *id.* § 136(t), and thus includes chemicals commonly known as herbicides (or weed killers). Enlist Duo herbicide is a "pesticide," because it is a mixture of active and inert ingredients that is intended to kill weeds.[3] Although glyphosate and 2,4-D are

[3] EPA's registration documents and this brief refer to Enlist Duo alternately as an "herbicide" and a "pesticide."

"pesticides" as well, they are also "active ingredients" when used in the "pesticide" Enlist Duo. *See id.* § 136(a), (u) (defining "active ingredient" and "pesticide"). EPA may issue either an "unconditional" or "conditional" registration for a pesticide. *See id.* § 136a(c)(5), (7).

## I. Unconditional pesticide registration

FIFRA authorizes EPA to unconditionally register a new pesticide, or unconditionally amend an existing pesticide registration, only upon determining that the pesticide "will perform its intended function without unreasonable adverse effects on the environment," and that "when used in accordance with widespread and commonly recognized practice it will not generally cause unreasonable adverse effects on the environment." *Id.* § 136a(c)(5)(C), (D); *see* 40 C.F.R. §§ 152.112(e), 152.44; *Nw. Coal. for Alternatives to Pesticides v. EPA*, 544 F.3d 1043, 1045 (9th Cir. 2008). The statute defines "unreasonable adverse effects on the environment" to include "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide." 7 U.S.C. § 136(bb).

"Unconditional registration necessarily requires sufficient data to evaluate the environmental risks." *Pollinator Stewardship Council*, 806 F.3d at 523; *see* 40 C.F.R. § 158.75. Before unconditionally registering a pesticide under § 136a(c)(5), EPA must review "all relevant data in the possession of the Agency," 40 C.F.R.

§ 152.112(b), and conclude "that no additional data are necessary to make the determinations required by [that standard]," *id.* § 152.112(c)—including the determinations that use of the pesticide will not cause unreasonable adverse effects, *see* 7 U.S.C. § 136a(c)(5)(C), (D); *Pollinator Stewardship Council*, 806 F.3d at 528.

## II. Conditional pesticide registration

If EPA lacks sufficient data to determine whether an application for a new or amended pesticide registration warrants unconditional approval, the agency may conditionally grant a new or amended registration for that pesticide—but only if certain criteria are met. 7 U.S.C. § 136a(c)(7). Conditional registration allows a pesticide to be marketed temporarily for specific uses on the condition that the registrant submit, within a limited time, all remaining data necessary for EPA to determine whether unconditional registration of those uses are justified. *See id.*

Although EPA may grant a conditional registration under three "special circumstances," *id.*, only one is relevant here because it is the only one on which the agency relied to register Enlist Duo, *see* ER 4, 30. Under § 136a(c)(7)(B):

> The [EPA] Administrator may conditionally amend the registration of a pesticide to permit additional uses of such pesticide notwithstanding that data concerning the pesticide may be insufficient to support an unconditional amendment, if the Administrator determines that (i) the applicant has submitted satisfactory data pertaining to the proposed additional use, and (ii) amending the registration in the manner proposed by the applicant would not significantly increase the risk of any unreasonable adverse effect on the environment.

*Id.* § 136a(c)(7)(B).

An applicant seeking amended registration under this provision "shall submit such data as would be required to obtain registration of a similar pesticide under [the unconditional registration standard]." *Id.* However, "[i]f the applicant is unable to submit an item of data (other than data pertaining to the proposed additional use) because it has not yet been generated," the EPA Administrator may amend the registration on the condition that the applicant submit the outstanding data "not later than the time such data are required to be submitted with respect to similar pesticides already registered." *Id.* That time is usually during the periodic "registration review" process, pursuant to which EPA must review every pesticide registration to make sure it "still satisfies the FIFRA standard for registration" in light of "new data or information." 40 C.F.R. § 155.53(a); s*ee* 7 U.S.C. § 136a(g). Registration review must be completed for each registered pesticide every fifteen years, and the agency assesses all pesticide products containing the same active ingredient as part of a single registration review case. *See* 40 C.F.R. §§ 155.40, 155.42.

## STATEMENT OF THE CASE

### I. Enlist Duo is a new pesticide combining 2,4-D and glyphosate that will increase 2,4-D use and bolster glyphosate use

Enlist Duo is a pesticide manufactured by Dow AgroSciences, LLC (Dow) that contains the active ingredients 2,4-D and glyphosate. ER 2. Although there are various forms of 2,4-D and glyphosate, the specific forms found in Enlist Duo are 2,4-dichlorophenoxyacetic acid choline salt (2,4-D choline salt) and glyphosate dimethylammonium salt. *See id.*

Enlist Duo is designed and registered for use on Enlist Duo-resistant corn, soybean, and cotton crops—that is, crops that have been genetically engineered (GE) to resist both 2,4-D and glyphosate, allowing Enlist Duo to be sprayed later in the growing season and in greater amounts, to kill weeds without killing treated crops. ER 321, 558, 1763-64. Although EPA had previously registered other pesticides containing 2,4-D for limited uses on 2,4-D-resistant corn, soybeans, and cotton, Enlist Duo is the first pesticide that EPA registered for additional, expanded uses on those crops. *See* ER 28. In contrast, all of Enlist Duo's uses of glyphosate on glyphosate-resistant corn, soybeans, and cotton are shared by previously registered pesticides containing glyphosate (many developed by Monsanto Co. and marketed under the trade name Roundup). *See* ER 1-3, 387.

EPA acknowledged that registration of Enlist Duo "will result in an increased usage of 2,4-D." ER 83, 158. This is primarily because of the new and

expanded ways in which the registration allows 2,4-D to be used. *See* ER 28, 158. Compared to other pesticides containing 2,4-D, Enlist Duo contemplates use of 2,4-D on 2,4-D-resistant corn for a significantly longer part of the growing season; on 2,4-D resistant soybean plants after they have emerged from the ground; and on 2,4-D-resistant cotton plants after they have emerged from the ground but before they are harvested.[4] *See* ER 28 (explaining in further detail why registration of Enlist Duo would expand 2,4-D use), 547, 558, 1763-64. The U.S. Department of Agriculture made similar findings and predicted that approval of Enlist Duo will cause a 200 to 600 percent increase in the overall use of 2,4-D. *See* ER 353.

While recognizing that registration of Enlist Duo would augment overall 2,4-D use, EPA failed to consider evidence that the registration would bolster total glyphosate use. The agency assumed (without citing any evidence) that Enlist Duo will not "significantly change the locations, methods, or volume of glyphosate used on corn, soybeans, or cotton" and that "any decision on the Enlist Duo™ registration . . . would only impact which glyphosate product would be used." ER 4; *accord* ER 84. But the agency did not actually assess how registration of Enlist

[4] Enlist Duo entails the very first uses of 2,4-D *choline salt* on 2,4-D-resistant corn, soybeans, and cotton. *See* ER 3. However, *non-choline-salt* forms of 2,4-D have previously been registered for more limited uses on these crops, including use on 2,4-D-resistant corn during an early phase of the growing season; use on 2,4-D-resistant soybeans before planting; and use on 2,4-D-resistant cotton before planting, for spot treatment, and after harvest. *See* ER 28.

Duo would affect total herbicide loading in the environment. *See* ER 1769. Rather, EPA noted that the analysis was "difficult" and the agency could reach no conclusions. *Id.*

Contrary to EPA's unsubstantiated assumption that registration of Enlist Duo would have no material effect on overall glyphosate use, evidence in the record indicates that the registration would abate or even reverse likely declines in glyphosate use. The evidence indicates that widespread use of glyphosate is causing weeds to develop resistance to the chemical, and that Enlist Duo provides growers with a unique means of addressing that problem. *See* ER 155-57, 1763, 1769.

In 2014, the U.S. Department of Agriculture recognized that the "nearly exclusive use of glyphosate over the past fifteen years led to the selection of glyphosate-resistant . . . weeds, weeds that could survive an application of the herbicide." ER 346. A 2012 survey of farmers in thirty-one states found that 49 percent reported having glyphosate-resistant weeds in their fields. ER 2005. During the Enlist Duo registration process, Dow represented that "increasing prevalence of glyphosate-resistant" weeds is "rapidly getting worse." ER 2133, 2136. EPA concurred, acknowledging that "resistance to glyphosate . . . has become a significant economic and pest management issue to growers." ER 28; *see* ER 559.

Glyphosate is rapidly losing efficacy, falling victim to its own popularity. ER 156-57. In comments to EPA, members of the agricultural industry reported that many growers are resorting to non-glyphosate-based pesticides. *See, e.g.*, ER 459 ("[O]nce glyphosate resistant weeds started to show up nearly everyone would use 2,4-D or some dicamba product to control weeds."). Agricultural scientists echoed this observation. *See, e.g.*, ER 508. Likewise, in case studies that Dow submitted to EPA, growers in areas infested with glyphosate-resistant weeds used a "variety of alternatives" to glyphosate, including not only other pesticides, but also increased tillage. ER 1766; *see also* ER 2136 (asserting that without new pesticides like Enlist Duo "to address problems with glyphosate-resistant weeds, U.S. growers will be forced to revert to earlier cultural practices"). Recognizing the severity of the problem, EPA concluded that "[t]he continued viability of the glyphosate . . . technology is widely predicated on the containment of currently resistant weed biotype populations and the delay of any future resistant weed biotype population development." ER 1768.

Enlist Duo is a "tool that could prolong the viability of the glyphosate herbicide technology." ER 1769; *accord* ER 28, 156, 558, 1763. Its two active ingredients have different mechanisms of action, which means that the 2,4-D in Enlist Duo can kill glyphosate-resistant weeds and stave off further weed resistance to glyphosate. ER 28, 156-57, 1762-64, 1768-69. This would allow more

glyphosate to remain on the market, for a longer time. Therefore, at a minimum, Enlist Duo is likely to perpetuate glyphosate use at levels well above what would otherwise be expected. *See* ER 1763, 1769. Enlist Duo may even cause glyphosate use to increase beyond current levels by, for example, allowing growers to expand crop acreage. *See, e.g.*, ER 458, 503; *see also* ER 560 (noting that "use of Enlist Duo on GE cotton is not expected to eliminate the use of any other herbicide"). But for Enlist Duo, there would be less use of both 2,4-D and glyphosate.

## II. Enlist Duo poses a significant risk to monarch butterflies

The use of herbicides on herbicide-resistant crops is a leading cause in the sharp decline of the eastern population of North American monarch butterflies.[5] ER 159-73. Each spring, the monarch population embarks on a multi-generational migration that begins in the forests of central Mexico. ER 266. The butterflies fly north across the United States, reproducing along the way. *Id.* By mid-to-late summer, over the span of four to five generations, the population reaches southern Canada. *See id.* In the fall, the last generation of monarchs flies back to the same forests in Mexico where the population's journey began. *See id.* The butterflies

[5] Monarch butterflies are found both east and west of the Rocky Mountains, although the western population is much smaller. ER 148 n.10. This brief focuses on the eastern population of North American monarchs because that population migrates across the thirty-four states where EPA has approved the use of Enlist Duo. *See id.*

overwinter in Mexico until spring, when the migration cycle begins again. *See id.*; *infra* Figure 1. The entire migration spans over 2,500 miles. ER 170.



Fig. 1. Aerial photo showing trees tinged orange by an overwintering monarch butterfly colony at El Rosario Monarch Reserve, Michoacán, Mexico. (C) Lincoln Brower 1999.

Monarchs cannot complete this extraordinary migration without milkweed. *See* ER 166-68, 212, 221-24, 266. Because monarch caterpillars eat only milkweed, migrating female monarchs lay their eggs only on milkweed. ER 167, 231, 403. When milkweed is scarce, females deplete large amounts of body fat in search of the plant, which can cause them to lay fewer eggs or even die before laying any eggs. ER 167-68, 303-04. Fewer eggs means fewer monarchs. ER 270. Reduction of milkweed also decreases the number of caterpillars that survive to

adulthood, by intensifying competition over a limited food supply. ER 298, 303-04.

EPA registered the first pesticide containing glyphosate in 1974. ER 160. As a non-selective herbicidal active ingredient, glyphosate does not discriminate between target and non-target plant species: it can damage and kill both crops and weeds. ER 2, 160, 267. For this reason, growers previously limited their use of herbicides containing glyphosate. ER 267.

In the mid-to-late 1990s, however, glyphosate-resistant crops were introduced to farmers and rapidly gained market share. ER 161, 257, 391. This triggered a dramatic increase in the application of glyphosate-based herbicides. ER 161-63, 391-92. In 1995, before the introduction of glyphosate-resistant crops, agricultural use of glyphosate totaled under 28 million pounds; by 2014, agricultural use of glyphosate skyrocketed to nearly 250 million pounds—an approximate tenfold increase. ER 391.

Glyphosate use has already decimated a substantial portion of the milkweed on which monarchs rely. ER 164-66, 267, 320-21. Milkweed loss, particularly in the Midwest, has been well documented, and is in large part attributed to increased glyphosate use. ER 257, 266. A survey of milkweed in Iowa corn and soybean fields in 1999 found milkweed in at least 50 percent of the fields. ER 257. By 2009, milkweed was recorded in only 8 percent of the fields. *Id.* Additionally, the

overall area occupied by milkweed within the fields decreased by 90 percent. *Id.* Relying on these and other data, one study extrapolated the loss of milkweed in both agricultural and non-agricultural areas across the entire Midwest and found a 58 percent decline in milkweed from 1999 to 2010. ER 266, 270.

The extensive loss of milkweed has devastated the monarch population. ER 166-73. The Midwest, in particular, constitutes a significant portion of the monarchs' migratory pathway. ER 229, 303-04. Fifty percent of monarchs that overwinter in Mexico feed on Midwestern milkweed as caterpillars, so reduced milkweed availability in this region has significant effects on the population. ER 229. Furthermore, monarchs tend to lay more eggs in agricultural areas than in non-agricultural areas. ER 239, 273. The decline of milkweed in the agricultural Midwest has thereby caused a greater-than-proportional reduction in monarch reproduction. *See* ER 168, 266, 273. Between 1999 and 2010, monarch reproduction in the Midwest declined by 81 percent. ER 266, 273.

Decreased monarch reproduction has caused the monarch population to plummet. *See* ER 168-69. During the same period that herbicide-resistant crops became prevalent in the United States, leading to rapidly accelerating herbicide use and milkweed loss, there has been a dramatic, corresponding decline in the overwintering monarch population in Mexico. ER 168-69, 266-73. That population dropped from a high of nearly 700 million butterflies in 1997 to a low of

approximately 25 million butterflies in 2014.[6] ER 377, 382. While interannual variation in the population size is expected, the long-term trend of decline is clear. *See* ER 403, 409-11.

It is widely acknowledged among monarch experts that a driving force behind the butterfly's decline is milkweed loss in the United States caused by widespread use of herbicides, particularly those containing glyphosate, on herbicide-resistant crops. *See* ER 168-70; 319-22, 2191-92; *see, e.g.*, ER 257-58; 261-62; 267, 303-04, 360-65, 403. A 2014 study examining the relative magnitude of different threats to monarchs found that "[r]ecent population declines stem from reduction in milkweed host plants in the United States that arise from increasing adoption of genetically modified crops and land-use change, not from climate change or degradation of forest habitats in Mexico." ER 297. The study concluded that "conserving monarch butterflies by addressing the negative impacts of changing land-use and the adoption of genetically-modified, herbicide-resistant crops on host plant abundance is the highest conservation priority." ER 304.

---

[6] The number of monarchs overwintering in Mexico is estimated by multiplying the total number of hectares occupied by the butterflies by their density per hectare. ER 377. Monarchs occupied 18.19 hectares of forest during the winter of 1996-1997 compared with .67 acres in the winter of 2013-2014. *Id.* The density of overwintering monarchs was recently estimated at 37.5 million butterflies per hectare. ER 382. To the extent that NRDC's comments used an older density estimate to calculate overwintering population size, the population estimates in the comments differ from those in this brief. *See, e.g.*, ER 159.

EPA's registration of Enlist Duo poses a significant risk to the beleaguered monarch population, threatening to drive it towards collapse. Enlist Duo is intended to suppress milkweed, and both 2,4-D and glyphosate are toxic to milkweed. ER 112, 158-60, 321-322. EPA's approval of Enlist Duo for use on herbicide-resistant crops is particularly problematic for monarchs. Herbicides are applied more frequently, and at higher rates, when used on herbicide-resistant crops. ER 320-21; *see, e.g.*, ER 28. In addition, herbicides that cause limited damage to target plants when applied at lower rates are often much more damaging when sprayed at higher rates. ER 321. Furthermore, milkweed tends to regrow when it is mowed, damaged by tilling, or treated with herbicides that are applied before milkweed shoots emerge in late spring. ER 320. But when herbicides are paired with herbicide-resistant crops, they can be applied later in the growing season during the milkweed plant's most vulnerable flowering stage. *Id.*

The final, approved label for Enlist Duo recommends application "when most [common milkweed] plants have reached the late bud to flower stage of growth," thereby reducing the chances that affected plants can recover and regrow. ER 112; *see* ER 320. Compounding the risk to monarchs, EPA registered Enlist Duo for use in thirty-four states that fall directly within the pathway of migrating butterflies. *Compare* ER 2, *with* ER 212-14, 229.

The migrating monarch population is already so diminished that its prospects for recovery are fading. ER 171-73. Continued milkweed loss renders the population susceptible to further decline, compromising its ability to withstand additional stressors such as severe weather, freezing temperatures, disease, predation, and deforestation. *See* ER 223, 262-63. In 2002, a single storm killed more than 450 million monarchs, which constituted approximately 75 percent of the overwintering population—and exceeded, by over three times, the 150 million monarchs overwintering in Mexico during the 2015-2016 season. *See* ER 252; *compare* ER 382 (estimating overwintering monarch population density of 37.5 million butterflies per hectare), *with* ER 409-11 (reporting that overwintering monarchs occupied 4.01 hectares during the 2015-2016 winter season).

Severe storms occur periodically, leaving the diminished monarch population in a precarious state. In 2004, another serious storm killed about 70 percent of the overwintering monarch population, with casualties far exceeding the total number of monarchs overwintering in Mexico during the recent 2015-2016 season. *Compare* ER 409 (reporting that overwintering monarch colonies occupied approximately 8 to 11.12 hectares during the 2003-2004 winter season, but only 4.01 hectares during the 2015-2016 winter season), *with* ER 412. Subsequently, a 2010 storm killed approximately 50 percent of the monarchs overwintering in Mexico. ER 262-63. Owing to its current size, the monarch population is

susceptible to complete eradication by comparable storms. ER 1097-1098; *see also* ER 406 (explaining that "tightly clustered overwintering colonies convey important microclimate advantages that diminish as colony size decreases," so that "[d]iminishing colony size can therefore result in higher winter mortality rates"). The smaller the population becomes, the more vulnerable it is to these kinds of natural events. ER 172-73, 1098.

Continued suppression of milkweed across the butterflies' breeding grounds perpetuates the risk of monarch population collapse, and additional milkweed destruction exacerbates that risk. ER 172-73. The population is so precariously small that experts—including those at the Department of Agriculture—have warned that the monarch migration may be coming to an end. *See, e.g.*, ER 263, 279-80, 405-06. In 2016, a group of academic researchers and scientists from federal and state agencies jointly published a study finding that migrating eastern monarchs face a "high probability of quasi-extinction [that is, population collapse] over the next two decades." ER 405. "Given the population's present low numbers," the study concluded, "poor reproductive success by monarchs in future breeding seasons due to weather conditions and reduced breeding habitat, followed by catastrophic mortality while over-wintering in Mexico, could bring the monarch migration to the brink of extinction." *Id.*

## III. Enlist Duo may pose serious risks to human health

There is a growing body of published scientific literature suggesting that exposure to either of Enlist Duo's active ingredients may cause significant human health risks. Glyphosate is the most widely used pesticide in the country, with about 250 million pounds applied to fields each year. ER 347, 391. People can be exposed to glyphosate on or near the many farms where the pesticide is used, as well as when they eat food, or drink water, contaminated with glyphosate. *See* ER 179-80, 3158-60, 3180 n.56.

Recent studies link exposure to glyphosate and glyphosate products to serious health harms, including kidney damage, birth defects, pre-term deliveries, miscarriages, and neural tube defects. *See, e.g.*, ER 173-74 & nn. 134-35, 176-77, 462-63; *see also* ER 515-16 (former EPA senior research scientist expressing concern about glyphosate's health risks, including its potential for endocrine disruption). Although EPA recently concluded that glyphosate is not likely to be carcinogenic to humans, ER 53, the agency registered Enlist Duo without considering new, peer-reviewed literature on glyphosate's non-cancer health risks highlighted by commenters, including NRDC. *See* ER 3 (refusing to conduct any new assessment for glyphosate); *see, e.g.*, ER 173-74 & nn. 134-35, 176-77.

2,4-D's exposure pathways are similar to glyphosate's; they include food residues, contaminated drinking water, spray drift, and vapor residues emitted from

treated fields. *See* ER 11-12, 14-16, 190-95. As with glyphosate, there are many published studies implicating 2,4-D in significant human health risks, such as thyroid problems and Non-Hodgkin lymphoma. ER 183-87, 463, 466-67. Although EPA concluded that 2,4-D does not present significant health risks, the agency's analyses are flawed. EPA disregarded evidence of 2,4-D's carcinogenicity and thyroid toxicity, and underestimated individuals' aggregate exposures to 2,4-D. ER 182-97, 463-67. The agency did not fully account for health risks posed by the 2,4-D in Enlist Duo, particularly to pregnant women and children. ER 188-97.

## IV. Procedural history

EPA's current order registering Enlist Duo supersedes two previous registration orders of more limited scope. *Compare* ER 1-2, 5, 37, *with* ER 1371-72, 1401, *and* ER 1019, 1055-56.

### A. EPA's previous registration orders (2014 and 2015)

On October 15, 2014, EPA issued a final order registering Enlist Duo for use on Enlist Duo-resistant corn and soybeans in six states.[7] ER 1371-72, 1394, 1400. EPA's decisional documents were unclear as to whether the registration was unconditional or conditional.[8] Because EPA failed to consider harm to monarchs

[7] Those states are Illinois, Indiana, Iowa, Ohio, South Dakota, and Wisconsin. ER 1400.

[8] Although the agency's Final Registration Decision referenced FIFRA's provision for conditional amendment, the Notice of Registration that EPA

and to fully evaluate glyphosate's health risks before registering Enlist Duo, NRDC petitioned this Court for review of EPA's order. Petition for Review, *NRDC v. EPA*, No. 14-73353 (9th Cir. Oct. 30, 2014), ECF No. 1-1; *see* ER 1372, 1436. The Center for Food Safety and other petitioners (CFS Petitioners) also challenged EPA's registration order on other grounds. Petition for Review, *CFS v. EPA*, No. 14-73359 (9th Cir. Oct. 30, 2014), ECF No. 1-2.

On March 31, 2015, EPA issued a second final order amending the registration of Enlist Duo to allow use on Enlist Duo-resistant corn and soybeans in nine additional states.[9] *See* ER 1055-56. Because EPA still had not examined harm to monarchs or fully assessed glyphosate's health risks, NRDC filed an additional petition for review challenging the amended registration order. Petition for Review, *NRDC v. EPA*, No. 15-71213 (9th Cir. Apr. 20, 2015), ECF No. 1-2. CFS Petitioners also filed an additional petition for review challenging this amended order. Petition for Review, *CFS v. EPA*, No. 15-71207 (9th Cir. Apr. 20, 2015), ECF No. 1-2.

---

concurrently issued deemed the registration unconditional. *Compare* ER 1394, *with* ER 1401. In defending the registration in litigation, EPA characterized the registration as unconditional. *See, e.g.*, Resp'ts' Mot. for Voluntary Vacatur and Remand at 3-4, *NRDC v.* EPA, No. 14-73353 (9th Cir. Nov. 24, 2015), ECF No. 121-1.

[9] Those states are Arkansas, Kansas, Louisiana, Minnesota, Mississippi, Missouri, Nebraska, North Dakota, and Oklahoma. ER 1056.

While the cases were pending, EPA discovered that Dow had filed an application with the U.S. Patent and Trademark Office claiming synergism between 2,4-D and glyphosate. ER 2-3. This discovery prompted the agency to concede that it "could no longer represent to the Court that its conclusions were correct regarding whether issuance of the registration met the standard in FIFRA." ER 3. Accordingly, EPA moved for remand and vacatur of the registration. *Id.* Dow opposed vacatur. *See* Resp. to Resp'ts' Mot. for Voluntary Vacatur and Remand at 2, *NRDC v. EPA*, No. 14-73353 (9th Cir. Dec. 7, 2015), ECF No. 122. On January 25, 2016, the Court granted the motion for remand but denied vacatur. ER 3.

**B. EPA's current registration order (2017)**

On October 31, 2016, EPA issued a new proposal to register Enlist Duo on Enlist Duo-resistant corn, soybeans, and cotton in thirty-four states. ER 521, 523. EPA invoked FIFRA's conditional registration provision generally, without specifying which of the three types of conditional registration it was considering. *See* ER 549. In addition, the agency explained that it had assessed some of the anticipated risks from the expanded use of 2,4-D that the registration would cause, but concluded that "no new assessment is needed for glyphosate" because "no new use patterns and no new exposures for glyphosate are being considered with this registration action." ER 522. EPA provided no indication that it had ever

considered 2,4-D's or glyphosate's potential to harm monarchs by destroying milkweed, or that it had evaluated recent literature on glyphosate's health risks.

NRDC timely submitted comments opposing the proposed registration on December 1, 2016. ER 144-211. In its comments, NRDC asserted that EPA may not conditionally register Enlist Duo, and explained that EPA must, consistent with FIFRA's unconditional registration provision, undertake the full range of analyses necessary to determine whether the registration would cause unreasonable adverse impacts on human health and the environment.[10] ER 206-11; *see* 7 U.S.C. § 136a(c)(5). The comments underscored EPA's obligation to "consider the substantial adverse impacts that Enlist Duo will have on monarch butterflies, insofar as both glyphosate and 2,4-D destroy milkweed, which is critical to the monarch life cycle." ER 151; *see* ER 158-73. In addition, the comments called on EPA to "complete an updated assessment of glyphosate's human health risks." ER 151. NRDC urged EPA to consider recent studies that had been published on glyphosate's health effects, including studies suggesting that glyphosate may cause kidney toxicity and birth defects. ER 173-78. Other commenters likewise requested

[10] NRDC's comments assumed that EPA was proposing to register Enlist Duo under § 136a(c)(7)(A) and explained why registration under that provision would be unlawful. ER 206-11. As described below, EPA ultimately relied on a different conditional registration provision, § 136a(c)(7)(B), to register Enlist Duo; the agency specified this choice for the first time in its Final Registration Decision. *See* ER 4, 30.

that EPA assess Enlist Duo's effects on monarch habitat and evaluate up-to-date science on glyphosate's health risks. *See* ER 484 (incorporating previous CFS comments); *see, e.g.*, ER 462-65, 515-16, 1714-22, 2191-92.

Disregarding these comments, EPA issued its third final order registering Enlist Duo on January 12, 2017. Mirroring the proposed order, the final order included "three new decisions":

> First, EPA is issuing a new decision on the currently registered Enlist Duo™ for use on GE soybean and corn in 15 states, following the remand decision . . . . Second, the EPA is granting the approval of Enlist Duo™ for use on GE soybean and corn in an additional 19 states.[[11]] Third, EPA is granting a new use for Enlist Duo™ on GE cotton in 34 states (corresponding with the 15 states previously registered [sic], plus the 19 additional states approved for use of Enlist Duo™ on GE corn and soybean).

ER 2. Together, the three decisions registered Enlist Duo for use on Enlist Duo-resistant corn, soybeans, and cotton in thirty-four states. *See id.*

Despite expressly characterizing these decisions as registration decisions for Enlist Duo, EPA simultaneously insisted that it was merely registering new uses of 2,4-D on 2,4-D-resistant corn, soybeans, and cotton. *See* ER 1-4, 29. The agency emphasized that the "application in front of

[11] Those states are Alabama, Arizona, Colorado, Delaware, Florida, Georgia, Kentucky, Maryland, Michigan, North Carolina, New Jersey, New Mexico, New York, Pennsylvania, South Carolina, Tennessee, Texas, Virginia, and West Virginia. ER 2.

EPA is for a new use for 2,4-D choline salt" and that "this new use action is specific to the 2,4-D." ER 3-4. As before, EPA maintained that it was "not taking any action as it relates to the glyphosate component of Enlist Duo." ER 4. Because "Enlist Duo™ uses on GE corn, soybeans, and cotton are already registered on other glyphosate products," EPA averred, "no new use patterns and no new exposures for glyphosate are being considered" and "no new assessment is needed for glyphosate." ER 3.

To justify its decisions, EPA haphazardly referenced three different FIFRA registration standards. ER 4, 28-30. First, the agency asserted that it "only registers a pesticide when it determines that it will not cause unreasonable adverse effects on man or the environment." ER 28. This is a criterion specific to the unconditional registration standard. *See* 7 U.S.C. § 136a(c)(5)(C). The order concluded that both glyphosate (based on data from preexisting pesticide registrations) and 2,4-D (based on currently available data), meet this criterion. *See* ER 4, 28-29. It is ambiguous whether EPA determined that Enlist Duo, as a whole, likewise meets this criterion. *See* ER 30 (concluding that "registering these uses will not generally cause unreasonable adverse effects on human health or the environment," but not specifying whether "these uses" refer to the new uses of 2,4-D, Enlist Duo, or both).

In addition, EPA referenced two different conditional registration standards to explain its new decisions. EPA purported to treat the glyphosate component of Enlist Duo “as if it were” a registration under § 136a(c)(7)(A). ER 3 & n.3, 4; *see* 7 U.S.C. § 136a(c)(7)(A) (allowing EPA to conditionally register, or conditionally amend an existing registration for, any pesticide or proposed use that is “identically or substantially similar to any currently registered pesticide and use thereof”). The agency qualified, however, that it was not actually relying on that provision to register either glyphosate or Enlist Duo. ER 3-4.

At the same time, EPA stated that it was registering the 2,4-D component of Enlist Duo under a different conditional registration provision, § 136a(c)(7)(B). ER 4. Ultimately, EPA also indicated that it was registering Enlist Duo under § 136a(c)(7)(B). ER 30. But not once did the agency explicitly address whether registration of Enlist Duo would “significantly increase the risk of any unreasonable adverse effect on the environment,” as required for registration under that provision. 7 U.S.C. § 136a(c)(7)(B). Of particular concern here, EPA neglected to consider Enlist Duo’s potential to harm monarch butterflies through its suppression of milkweed, and the agency ignored new evidence of glyphosate’s human health risks.

On March 21, 2017, NRDC filed a petition for review in this Court challenging the registration. Case No. 17-70817, ECF No. 1-5. That same day, a group of petitioners led by the National Family Farm Coalition filed a separate petition for review challenging the registration. Case No. 17-70810, ECF No. 1-2. The Court consolidated the two lawsuits. Case No. 17-70810, ECF No. 14.

## SUMMARY OF ARGUMENT

**I.** EPA violated FIFRA by registering Enlist Duo, a new pesticide, under § 136a(c)(7)(B), even though that provision authorizes EPA only to "amend" existing registrations. 7 U.S.C. § 136a(c)(7)(B). To escape the plain meaning of the statute, EPA treated the application to register Enlist Duo as though it were simply an application to amend an existing registration of one of Enlist Duo's two active ingredients: 2,4-D. But even if EPA may amend an existing registration of 2,4-D under § 136a(c)(7)(B), this does not mean that the agency may register Enlist Duo, a new pesticide, under the same provision. EPA fails to provide a reasonable explanation for how the plain language of § 136a(c)(7)(B) permits the agency to register the inaugural uses of Enlist Duo.

In addition, EPA may not rely on § 136a(c)(7)(B) to avoid assessing all available, relevant information on the full range of Enlist Duo's risks. Section 136a(c)(7)(B) requires EPA to assess only the incremental risks associated with the

additional uses of a previously registered pesticide, based on data specific to those additional uses. *See id.* In contrast, unconditional registration requires EPA to comprehensively assess all of a pesticide's risks, based on data sufficient to inform that thorough analysis. *See id.* § 136a(c)(5); 40 C.F.R. §§ 152.112(c), 158.75. To grant an unconditional registration, EPA must determine—based on all relevant data before the agency—that Enlist Duo would not cause "unreasonable adverse effects" on human health or the environment.[12] 7 U.S.C. § 136a(c)(5)(C), (D); *see* 40 C.F.R. § 152.112(b), (e).

Here, EPA evaded the analysis for unconditional registration through its improper reliance on § 136a(c)(7)(B). The agency refused even to consider pertinent, recent studies indicating that glyphosate may cause serious human health harms such as kidney toxicity and birth defects. Similarly, despite having never assessed, in relation to any prior pesticide application, glyphosate's potential to harm monarchs by destroying milkweed, EPA declined to consider the weighty evidence that NRDC and others put before the agency substantiating this harm.

**II.** In the alternative, even if EPA may conditionally register the very first uses of Enlist Duo under § 136a(c)(7)(B), the agency must first determine that those uses "would not significantly increase the risk of any unreasonable adverse effect

[12] EPA must also make other determinations that are not relevant here. *See* 7 U.S.C. § 136a(c)(5).

on the environment" beyond the risks posed by currently registered pesticides containing 2,4-D or glyphosate. 7 U.S.C. § 136a(c)(7)(B).

In public comments, NRDC and others timely notified EPA of extensive evidence that use of herbicides on herbicide-resistant crops has been a dominant cause of monarch-habitat destruction and resulting population decline. 2,4-D kills milkweed, and EPA recognized that registering Enlist Duo for new uses on 2,4-D-resistant crops will expand overall use of 2,4-D. The agency nonetheless failed to assess how Enlist Duo's expanded uses of 2,4-D would affect milkweed and monarchs. In addition, EPA ignored evidence that registration of Enlist Duo for use on glyphosate-resistant crops will bolster widespread use of glyphosate, insofar as the novel combination of 2,4-D and glyphosate in Enlist Duo will stave off rapidly spreading weed-resistance to glyphosate that would otherwise limit glyphosate's efficacy. Because Enlist Duo is likely to reinvigorate glyphosate use, EPA must consider glyphosate's potential to harm milkweed and monarchs, and to adversely affect human health—concerns repeatedly identified in recent scientific literature that EPA failed to consider.

By declining to assess evidence of Enlist Duo's incremental impacts on monarchs and human health, EPA lacked substantial evidence to conclude that registration of Enlist Duo "would not significantly increase the risk of any

unreasonable adverse effect on the environment." 7 U.S.C. § 136a(c)(7)(B). The registration should therefore be vacated.

## STANDARD OF REVIEW

Under FIFRA, a pesticide-registration order "shall be sustained if it is supported by substantial evidence when considered on the record as a whole." 7 U.S.C. § 136n(b). "Substantial evidence means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *NRDC v. EPA* (*Nanosilver II*), 857 F.3d 1030, 1036 (9th Cir. 2017) (quoting *NRDC v. EPA* (*Nanosilver I*), 735 F.3d 873, 877 (9th Cir. 2013)). "Although the substantial evidence standard of review is relatively deferential to the agency factfinder, [the Court's] review still must be searching and careful, subjecting the agency's decision to close judicial scrutiny." *Containerfreight Corp. v. United States*, 752 F.2d 419, 422 (9th Cir. 1985) (internal quotation marks omitted).

To the extent that the "substantial evidence" test differs from arbitrary-and-capricious review under the Administrative Procedure Act, "Congress expected greater scrutiny when the enabling statute contains a substantial evidence test." *Union Oil Co. of Cal. v. Fed. Power Comm'n*, 542 F.2d 1036, 1041 (9th Cir. 1976). Consequently, "if the EPA's pesticide registration is arbitrary and

capricious, the EPA cannot show it was supported by substantial evidence." *Pollinator Stewardship Council*, 806 F.3d at 1188 (Smith, N.R., J., concurring).

To survive the arbitrary-and-capricious test, and hence substantial-evidence review, an "agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)). An agency's decision cannot be supported by substantial evidence if the agency failed to consider adequate relevant data. *See Pollinator Stewardship Council*, 806 F.3d at 532. ("Without sufficient data, the EPA has no real idea whether sulfoxaflor will cause unreasonable adverse effects on bees, as prohibited by FIFRA. Accordingly, the EPA's decision to register sulfoxaflor was not supported by substantial evidence."). Nor can the agency meet this standard if it "entirely failed to consider an important aspect of the problem." *State Farm*, 463 U.S. at 43; *accord Mont. Wilderness Ass'n v. McAllister*, 666 F.3d 549, 555, 558, 561 (9th Cir. 2011). Further, "[i]t is well-established that an agency's action must be upheld, if at all, on the basis articulated by the agency itself." *Nanosilver II*, 857 F.3d at 1036 (alteration in original) (quoting *Nanosilver I*, 735 F.3d at 877).

## ARGUMENT

### I. EPA's registration of Enlist Duo is unlawful because FIFRA does not authorize EPA to register a new pesticide under § 136a(c)(7)(B)

Section 136a(c)(7)(B)'s grant of authority to EPA is narrow: the agency may only "amend" existing pesticide registrations conditionally to "permit additional uses." 7 U.S.C. § 136a(c)(7)(B). Enlist Duo is a new pesticide, never before registered. For this reason, it is not eligible for amended registration under § 136a(c)(7)(B).

#### A. EPA's registration of Enlist Duo contravenes the plain text of § 136a(c)(7)(B)

"The preeminent canon of statutory interpretation requires [courts] to presume that [the] legislature says in a statute what it means and means in a statute what it says there." *L.A. Lakers, Inc. v. Fed. Ins. Co.*, 869 F.3d 795, 802 (9th Cir. 2017) (second alternation in original) (internal quotation marks omitted). Section 136a(c)(7)(B) plainly states that EPA may "conditionally *amend* the registration of a pesticide to permit *additional uses* of such pesticide." 7 U.S.C. § 136a(c)(7)(B) (emphases added). In accordance with the ordinary meaning of those terms, EPA cannot "amend" the registration of "a pesticide," or add "additional uses" to the registration of "such pesticide," if there is no lawful registration of that pesticide in the first place. *See Yith v. Nielsen*, 881 F.3d 1155, 1165 (9th Cir. 2018) ("[U]nless otherwise defined, words will be interpreted as

taking their ordinary, contemporary, common meaning."); 7 U.S.C. § 136 (providing no definition for "amend" or "additional"). This means that new pesticides do not qualify for registration under § 136a(c)(7)(B).

As a novel mixture of glyphosate, 2,4-D, and various inert ingredients, Enlist Duo is a new pesticide. *See* 7 U.S.C. § 136(u) (defining pesticide as "any substance or mixture of substances intended for preventing, destroying, repelling, or mitigating any pest"). The registration challenged here is the only operative registration for Enlist Duo, because it supersedes EPA's earlier registration orders, which this Court remanded to the agency. *See* ER 3; Resp'ts' Opp'n to Pet'rs' Mot. to Adjudicate Pending Claims or, in the Alternative, to Stay the Mandate and Retain Jurisdiction at 8-9, *NRDC v. EPA*, No. 14-73353 (9th Cir. Mar. 21, 2016), ECF No. 130-1 (conveying EPA's intent that the previous registration orders be fully incorporated into, or replaced by, the new final registration order issued by the agency following remand); *compare* ER 1-2, 5, 37 (2017 final registration documents), *with* ER 1371-72, 1401 (2014 final registration documents), *and* ER 1019, 1055-56 (2015 final registration documents). There is thus no valid, preexisting registration of Enlist Duo for EPA to "amend." Similarly, because there are no lawful, previously approved uses of Enlist Duo, the new uses approved by EPA do not qualify as "additional uses" of the pesticide. As a consequence, EPA may not register Enlist Duo under § 136a(c)(7)(B).

It is a "core administrative-law principle that an agency may not rewrite clear statutory terms to suit its own sense of how the statute should operate." *Util. Air Regulatory Grp. v. EPA*, 134 S. Ct. 2427, 2446 (2014); *see also id.* at 2445. Defying this fundamental principle, EPA has essentially rewritten § 136a(c)(7)(B) to say:

> The Administrator may conditionally ~~amend~~ grant the registration of a pesticide to permit ~~additional~~ uses of such pesticide notwithstanding that data concerning the pesticide may be insufficient to support an unconditional ~~amendment~~ registration, if the Administrator determines that (i) the applicant has submitted satisfactory data pertaining to the proposed ~~additional~~ use, and (ii) ~~amending~~ granting the registration in the manner proposed by the applicant would not significantly increase the risk of any unreasonable adverse effect on the environment.

7 U.S.C. § 136a(c)(7)(B). "[T]he need to rewrite clear provisions of the statute should have alerted EPA that it had taken a wrong interpretive turn." *Util. Air Regulatory Grp.*, 134 S. Ct. at 2446. Instead, EPA ignored the plain language of § 136a(c)(7)(B) and proceeded to register Enlist Duo under its distorted interpretation of that provision.

"An agency," however, "has no power to 'tailor' legislation to bureaucratic policy goals by rewriting unambiguous statutory terms." *Id.* at 2445. Here, FIFRA's plain text forecloses EPA from relying on § 136a(c)(7)(B) to register Enlist Duo. Because the Court's "inquiry begins with the statutory text, and ends there as well," the registration is unlawful and must be nullified. *Nat'l Ass'n of*

*Mfrs. v. Dep't of Def.*, 138 S. Ct. 617, 631 (2018); *see also Benitez v. Califano*, 573 F.2d 653, 655 (9th Cir. 1978) (holding that regardless of whether an agency's findings are supported by substantial evidence, a decision "should be set aside if the proper legal standards were not applied in weighing the evidence and making the decision").

**B. EPA fails to provide a reasonable explanation that reconciles its registration of Enlist Duo with the plain text of § 136a(c)(7)(B)**

EPA attempts to circumvent § 136a(c)(7)(B)'s plain inapplicability to Enlist Duo by claiming that the "new use . . . being conditionally registered under FIFRA section 3(c)(7(B) [sic]" is merely "a new use for 2,4-D choline salt." ER 4; *see* ER 29. But both EPA's Final Registration Decision and its Notice of Registration state that the agency registered "Enlist Duo"—and not "2,4-D Choline Salt." ER 1, 37. Simply put, Enlist Duo is not 2,4-D. EPA may not claim that it registered only new uses of the active ingredient 2,4-D when it actually registered new uses of Enlist Duo, a distinct and novel pesticide. *See* 7 U.S.C. § 136(u). That EPA voluntarily moved to remand and vacate its previous registrations of Enlist Duo to scrutinize potential synergistic effects between the pesticide's active ingredients underscores that a pesticide containing multiple active ingredients must be evaluated as an integrated unit, and confirms that it is Enlist Duo, and not just 2,4-D, that is a subject of this registration. *See* ER 4-5, 23-24, 54-56, 66-69. Despite the agency's attempted sleight-of-hand, the "pesticide" at issue in this § 136a(c)(7)(B) analysis

is Enlist Duo, and the phrases "a pesticide" and "such pesticide" in that provision must refer to Enlist Duo. 7 U.S.C. § 136a(c)(7)(B).

Although EPA could "conditionally amend the registration of [Enlist Duo] to permit additional uses of [Enlist Duo]" after Enlist Duo has already been lawfully registered, EPA may not rely on § 136a(c)(7)(B) to register Enlist Duo in the first instance. *Id.* If, as EPA represents, "the application in front of EPA is for a new use for 2,4-D choline salt"—and if, as EPA asserts, it "only assess[ed] the risks and benefits of the active ingredient [2,4-D choline salt]"—then the registration EPA granted should have been limited to "a new use for 2,4-D choline salt," and not extended to the inaugural use of Enlist Duo. ER 3, 4.

"[A]n agency's action must be upheld, if at all, on the basis articulated by the agency itself." *Nanosilver II*, 857 F.3d at 1036 (quoting *Nanosilver I*, 735 F.3d at 877). Here, EPA failed to explain how its registration of Enlist Duo under § 136a(c)(7)(B) can be squared with the plain text of that provision.[13] The convoluted reasoning that EPA offered to support its decisions—mixing and matching elements of three different registration standards to justify the agency's diverging approaches to the 2,4-D component of Enlist Duo, the glyphosate component of Enlist Duo, and Enlist Duo herbicide overall—goes further to show

[13] Nor has EPA attempted to demonstrate that there is substantial evidence to support registration of Enlist Duo under any other FIFRA registration provision.

that EPA cannot articulate an interpretation of § 136a(c)(7)(B) that permits it to register Enlist Duo. *See supra* Statement of the Case IV.B.

### C. EPA's misguided approach to § 136a(c)(7)(B) undermines FIFRA's core purpose because it allows new pesticides on the market without adequate assessment of their risks

FIFRA aims "to protect against the risk of harm from pesticide products." *Sultan Chemists, Inc. v. EPA*, 281 F.3d 73, 83 (3d Cir. 2002). EPA's unlawful reliance on § 136a(c)(7)(B) has the practical consequence of allowing the agency to defer evaluating evidence relating to the full range of Enlist Duo's risks, in defiance of the statute's fundamental purpose. In particular, EPA relied on § 136a(c)(7)(B) to ignore evidence before the agency regarding the glyphosate component of Enlist Duo.[14]

Section 136a(c)(7)(B) instructs EPA to determine whether "amending the registration" of a pesticide to grant additional uses will "significantly increase the risk of any unreasonable adverse effect" on human health and the environment. 7 U.S.C. § 136a(c)(7)(B); *see id.* § 136(bb). Under this standard, the agency evaluates only the *incremental increase in risk* created by a pesticide's additional

[14] Although EPA also disregarded evidence relating to risks posed by the 2,4-D in Enlist Duo, the agency did not attempt to justify its failure to consider that evidence through its reliance on § 136a(c)(7)(B). Instead, the agency simply glossed over the omission without providing any responsive explanation. *See infra* Argument II.A.

uses—and does so based on the limited set of data pertinent to that incremental risk. By contrast, when EPA unconditionally registers a new pesticide, the agency conducts a comprehensive assessment of *all risks* of unreasonable adverse effects posed by the pesticide. *See id.* § 136a(c)(5). This assessment requires EPA to evaluate "all relevant data in the possession of the Agency." 40 C.F.R. § 152.112(b); *accord Pollinator Stewardship Council*, 806 F.3d at 528. Through its unlawful invocation of § 136a(c)(7)(B), EPA selected a narrower scope for its risk assessment than would be required for unconditional registration, both in terms of the breadth of the risks evaluated and the range of the data necessary to support that analysis.

As a result, EPA ignored critical evidence of risks posed by Enlist Duo. NRDC presented EPA with overwhelming evidence that the glyphosate in Enlist Duo harms monarchs by killing milkweed. *See supra* Statement of the Case II; ER 15-30. NRDC also referred EPA to new peer-reviewed studies indicating that glyphosate may cause serious health risks, including kidney toxicity and birth defects. *See supra* Statement of the Case III. EPA had never evaluated this information in connection with any previous registration of a glyphosate-containing pesticide. Yet, the agency refused to consider this new evidence of glyphosate's harms before registering Enlist Duo. *See* ER 3-4. EPA did not find that the new data were irrelevant or not credible. Instead, it claimed that registering

Enlist Duo would not significantly affect glyphosate use,[15] and thus no new risk analysis of glyphosate was necessary. *See id.*

But had EPA used the § 136a(c)(5) standard for unconditional registration to assess Dow's application to register Enlist Duo, the agency could not have ignored new, "relevant data in the possession of the Agency," 40 C.F.R. § 152.112(b)—even if EPA were correct that Enlist Duo would not materially change overall glyphosate use. While EPA certainly could have drawn on past assessments of glyphosate, *see* 7 U.S.C. § 136a(c)(1)(F), the agency could not disregard new data before it about glyphosate's health and environmental harms. *Compare* ER 3-4, *with* ER 1438 ("Proposed new registrations are held to the most current data requirements and up-to-date risk assessment practices and must meet the FIFRA no unreasonable adverse effects standard to be registered.").

Affirming EPA's misuse of § 136a(c)(7)(B) would allow the agency to defer evaluating relevant evidence of Enlist Duo's risks, thereby undermining the statute's core purpose to prevent unreasonable harm from pesticide use. *See Cty. of Amador v. U.S. Dep't of Interior*, 872 F.3d 1012, 1022 (9th Cir. 2017) (noting that a statute should be interpreted with respect to its purpose); *Sultan Chemists*, 281 F.3d at 83; *N.Y. State Pesticide Coal., Inc. v. Jorling*, 874 F.2d 115, 117 (2d Cir.

[15] As discussed below, this determination is not supported by substantial evidence. *See infra* Argument II.B.

1989) (explaining that Congress passed FIFRA to protect humans and the environment from the "deleterious effects" of pesticides); *see also* 7 U.S.C. § 136a(a) (authorizing EPA to restrict the sale or distribution of any unregistered pesticide "[t]o the extent necessary to prevent unreasonable adverse effects on the environment"); *Ma v. Ashcroft*, 361 F.3d 553, 558 (9th Cir. 2004) (stating that statutory interpretations producing absurd results are to be avoided).

## II. EPA's registration of Enlist Duo under § 136a(c)(7)(B) is not supported by substantial evidence because EPA failed adequately to consider increased risk of harm to monarch butterflies and human health

In the alternative, even if FIFRA allows EPA to conditionally register new uses of Enlist Duo under § 136a(c)(7)(B) in the atextual manner proposed, the agency must still determine that the registration "would not significantly increase the risk of any unreasonable adverse effect on the environment." 7 U.S.C. § 136a(c)(7)(B). EPA lacked substantial evidence to conclude that Enlist Duo satisfies this criterion,[16] because it ignored evidence that the pesticide's new uses of 2,4-D would harm the imperiled monarch population through destruction of additional milkweed habitat; as well as evidence that the registration would bolster glyphosate use and the associated risks to milkweed and monarchs, and to human health.

[16] If EPA reached this conclusion for Enlist Duo, as opposed to just 2,4-D, it did so implicitly rather than explicitly. *See* ER 28-30. For the sake of this argument in the alternative, Petitioners assume that the agency did reach this conclusion.

### A. EPA declined to assess harm to milkweed and monarchs from Enlist Duo's expansion of 2,4-D use

In public comments on EPA's proposed decisions to register Enlist Duo, NRDC and others brought to the agency's attention an extensive body of scientific literature documenting the significant decline of the North American monarch butterfly population. *See* ER 159, 164-73, 319-20. The comments alerted EPA to the considerable risk that Enlist Duo poses to monarchs, and specifically noted that this risk arises in part from Enlist Duo's inclusion of 2,4-D, which kills the milkweed that monarchs need to survive. ER 158-73, 319-22, 2191-92.

Although, in contrast to its approach toward glyphosate, EPA did conduct new analyses of some risks posed by 2,4-D, it failed to consider harm to monarch habitat. The new uses of Enlist Duo approved by EPA present an acute threat to monarchs by increasing 2,4-D use and thereby reducing agricultural milkweed habitat. EPA's registration of Enlist Duo will increase 2,4-D use by as much as 600 percent. ER 83, 353. But the risk to monarchs comes not just from the steep rise in use of an active ingredient that targets milkweed, but also from changes in how that chemical can now be used. EPA's registration of Enlist Duo allows 2,4-D to be applied both at higher rates and later in the growing season, during milkweed's vulnerable flowering stage. *See* ER 28, 320-21, 547, 1765. Without evaluating potential harm to monarchs' milkweed habitat from Enlist Duo's new uses of 2,4-D, EPA lacked substantial evidence to conclude that Enlist Duo would not

"significantly increase the risk of any unreasonable adverse effect on the environment." 7 U.S.C. § 136a(c)(7)(B).

Although the question of risks to monarchs through increased milkweed destruction was properly before the agency, EPA refused to consider it before registering Enlist Duo. In its Response to Comments, EPA skirted the issue through two oblique responses. First, EPA proffered its completion of a 2,4-D-related "non-target direct effects risk assessment for terrestrial invertebrates, specifically referencing monarch butterflies as a member of this taxa" and cited its underlying 2016 Ecological Risk Assessment. ER 63-64; *see* ER 568. But the "direct effects" that EPA studied included only acute oral and contact toxicity to monarchs from direct 2,4-D exposure—and did not include any indirect effects that the 2,4-D in Enlist Duo would have on monarchs *through destruction of the butterflies' milkweed habitat*. *See* ER 626-28, 66; *see also* ER 173 (commenting to EPA that "it is not sufficient for EPA to examine whether 2,4-D is toxic to monarchs or other invertebrates").

Second, EPA asserted that it had "conducted a risk assessment for the combined toxic effects to non-target plants . . . for glyphosate and 2,4-D choline" and concluded "that effects to non-target plants . . . would be limited to the treated field itself." ER 63. But EPA was silent as to how Enlist Duo's effects on milkweed—a *target* plant that grows *within* treated

fields, *see* ER 112—would affect the monarch population. Notably, there is evidence that monarchs have a pronounced preference for milkweed in agricultural fields and lay more eggs there. ER 239, 273. Consequently, further milkweed decline in agricultural fields across thirty-four states squarely within the monarch migration pathway could have particularly significant repercussions for the species' survival. *See* ER 168, 266, 273.

Without considering how Enlist Duo's novel uses of 2,4-D would impact monarchs through their effects on milkweed, EPA lacked substantial evidence to conclude that Enlist Duo "would not significantly increase the risk of any unreasonable adverse effect on the environment," as required for registration under § 136a(c)(7)(B). 7 U.S.C. § 136a(c)(7)(B); *see Pollinator Stewardship Council*, 806 F.3d at 532. Because EPA "entirely failed to consider an important aspect of the problem," its registration decisions were arbitrary, capricious, and not in accordance with the law. *State Farm*, 463 U.S. at 43; *accord Mont. Wilderness Ass'n*, 666 F.3d at 555, 558, 561. It follows that the decisions fail the substantial evidence test under FIFRA, which is at least as rigorous as arbitrary-and-capricious review. *See Union Oil Co. of Cal.*, 542 F.2d at 1041.

The Court need not find that Enlist Duo increases risks to monarchs to vacate the unlawful registration: that is a question for EPA. It is possible that had EPA considered Enlist Duo's harm to monarch habitat, it would have concluded

that the pesticide “would not significantly increase the risk of any unreasonable adverse effect on the environment.” 7 U.S.C. § 136a(c)(7)(B). The agency’s legal error was in refusing even to consider the matter before registering Enlist Duo. *See State Farm*, 463 U.S. at 43; *Mont. Wilderness Ass’n*, 666 F.3d at 555, 558, 561. Without having done so, EPA’s decisions lack substantial evidence and violate the law.

### B. EPA ignored evidence that registering Enlist Duo would result in increased glyphosate use over time and thereby amplify risks that glyphosate poses to both monarchs and humans

There is considerable evidence in the record suggesting that glyphosate use would decrease but for EPA’s registration of Enlist Duo. As the agency observed, “weed control experts warn that the problem of glyphosate resistance is increasing, and that significant economic consequences will continue to increase without effective alternatives for weed control.” ER 29-30. In other words, glyphosate is losing efficacy, as confirmed by comments from growers and experts reporting adoption of non-glyphosate-based alternatives. *See, e.g.*, ER 459, 507.

Enlist Duo presents a pathway for reversing, or at least slowing, glyphosate’s descent toward obsolescence: “the herbicide combination in this weed control systems approach could potentially prolong the effectiveness of the glyphosate technology if the two herbicides are controlling weeds that are not resistant to either herbicide.” ER 28. As a result, Enlist Duo may perpetuate

glyphosate use at higher levels, for a longer time, in comparison to a landscape without Enlist Duo.

Compared to that status quo, registration of Enlist Duo will thus likely amplify glyphosate use and any risks inherent in that use. These include not only risks to monarchs from destruction of milkweed, *see supra* Statement of the Case II, but also risks to human health, as identified in recent scientific studies that EPA declined to consider, *see supra* Statement of the Case III. EPA assumed, without evidence, that registration of Enlist Duo will not "significantly change the locations, methods, or volume of glyphosate used on corn, soybeans, or cotton." ER 4. But without any analysis to support this "expect[ation]," *id.*, and without considering the new evidence of glyphosate's potential to harm monarchs and human health, the agency lacked substantial evidence to conclude that Enlist Duo "would not significantly increase the risk of any unreasonable adverse effect on the environment." 7 U.S.C. § 136a(c)(7)(B); *see Nanosilver II*, 857 F.3d at 1039-40 (holding as unsupported by substantial evidence EPA's finding that registration of a new nanosilver pesticide was in the public interest because it may reduce the total amount of silver released to the environment, where the agency failed to substantiate the assumptions underlying that finding).

As with 2,4-D's potential to harm milkweed and monarchs, the Court need not decide that the glyphosate in Enlist Duo actually increases risk of harm to

monarchs or human health. The agency erred by failing to evaluate evidence of those risks before registering Enlist Duo, and this failure warrants vacatur.[17] *See State Farm*, 463 U.S. at 43, 56; *Mont. Wilderness Ass'n*, 666 F.3d at 555, 558, 561.

## III. NRDC has standing to challenge EPA's registration of Enlist Duo

To establish standing, NRDC must show that the interests it seeks to protect are germane to its organizational purposes, that this litigation will not require its members' individual participation, and that its members would have standing to sue in their own right. *See Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).

NRDC satisfies this test. Protection of wildlife and human health is germane to NRDC's organizational mission, which is "to safeguard the Earth: its people, its plants and animals, and the natural systems on which all life depends." Trujillo Decl. ¶¶ 6-8 (ADD 065-66). In addition, this lawsuit does not require the

---

[17] To the extent that vacatur of the 2017 registration order would result in reinstatement of the 2014 and 2015 registration orders, those earlier orders should also be vacated. The Supreme Court has "[made] clear that the touchstone of vacatur is equity," *Dilley v. Gunn*, 64 F.3d 1365, 1370 (9th Cir. 1995), and it would be inequitable to allow EPA to reinstate the 2014 and 2015 orders following vacatur of the 2017 order. Those earlier orders are fully incorporated into the 2017 order, *see* ER 5 ("[T]he agency has made the decision to maintain the previously approved uses of Enlist Duo™ on GE corn and soybeans in 15 states with no changes to the original registration, as amended."), and are unlawful for the same reasons. Furthermore, Petitioners timely challenged the earlier orders, but this Court dismissed Petitioners' challenge after granting EPA's voluntary motion for remand. *See* Order, *NRDC v. EPA*, No. 14-73353 (9th Cir. Jan. 25, 2016), ECF No. 128; Order, *NRDC v. EPA*, No. 14-73353 (9th Cir. Mar. 28, 2016), ECF No. 132.

participation of individual NRDC members, because NRDC does not seek any individualized relief for its members. *See Hunt*, 432 U.S. at 344.

NRDC's members would have standing to sue on their own because they suffer "injury in fact" that is fairly traceable to the challenged EPA order and likely to be redressed by a favorable decision. *See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180-81 (2000) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992)). NRDC members suffer at least two injuries from the Enlist Duo registration: health risks from potential exposure to Enlist Duo and diminished enjoyment of their natural environment resulting from loss of monarch butterflies.

First, NRDC's members include individuals who live in areas where Enlist Duo is registered for use and who risk exposure to the pesticide during their daily activities. Gruber Decl. ¶¶ 4-9 (ADD 059-61); Bristol ¶¶ 2-8 (ADD 051-53); Wetzel Decl. ¶¶ 3-9 (ADD 069-72). Because both active ingredients in Enlist Duo are linked to serious health harms, NRDC's members are reasonably concerned that exposure to Enlist Duo may harm them. *See* ER 148-51, 173-97, 202-05 (identifying potential health risks from exposure to glyphosate and 2,4-D); Gruber Decl. ¶¶ 4-9 (ADD 059-61); Bristol ¶¶ 2-8 (ADD 051-53); Wetzel Decl. ¶¶ 3-9 (ADD 069-72). These members have no control over whether, when, how, and where Enlist Duo will be applied to corn, soybean, and cotton crops grown in their

communities. Gruber Decl. ¶ 9 (ADD 060-61); Bristol ¶¶ 2-8 (ADD 051-53); Wetzel Decl. ¶¶ 3-9 (ADD 069-72). This "credible threat of harm" to NRDC members' health interests "is sufficient to constitute actual injury for standing purposes." *Cent. Delta Water Agency v. United States*, 306 F.3d 938, 950 (9th Cir. 2002); *see Nanosilver I*, 735 F.3d at 878-79 (holding that NRDC had standing to challenge EPA's registration of a pesticide that "increase[d] the threat of future harm to NRDC's members").

In addition, NRDC's members include individuals who enjoy observing, studying, and interacting with monarch butterflies in the states where EPA has approved the use of Enlist Duo. Gruber Decl. ¶¶ 10-12 (ADD 061); Bristol ¶¶ 10-14 (ADD 053-54); Wetzel Decl. ¶¶ 10-15 (ADD 072-74). These members' "desire to use or observe an animal species, even for purely esthetic purposes, is undeniably a cognizable interest for purpose of standing." *Lujan*, 504 U.S. at 562-63. EPA's registration of Enlist Duo is likely to exacerbate milkweed and monarch decline. For these reasons, the registration harms these members' interests in monarch butterflies and impairs their enjoyment of the outdoors. Gruber Decl. ¶¶ 10-12 (ADD 061); Bristol ¶¶ 10-14 (ADD 053-54); Wetzel Decl. ¶¶ 10-15 (ADD 072-74).

The injuries to NRDC members' health and enjoyment of monarch butterflies are fairly traceable to EPA's order registering Enlist Duo. EPA's

registration order enables the sale and distribution of Enlist Duo, thereby allowing Enlist Duo to be used in ways that may expose NRDC members to the herbicide and making it possible for Enlist Duo to harm milkweed and monarchs.

Finally, the injuries to NRDC members are likely to be redressed, at least in part, by an order vacating Enlist Duo's registration. If the Court vacates the registration, Enlist Duo will no longer be authorized for sale or distribution in the United States. As a result, vacatur would prevent NRDC members from being exposed to Enlist Duo, ameliorating their concerns and eliminating the health risks from that exposure. Vacatur would also help to safeguard NRDC members' interests in observing and interacting with monarch butterflies. Enlist Duo's registration is expected to increase 2,4-D use and bolster glyphosate use, which is likely to harm milkweed. *See supra* Statement of the Case I; Argument II.B. Vacating the registration would prevent this adverse effect, thereby benefiting monarch butterflies and NRDC's members. NRDC therefore has standing to challenge EPA's registration of Enlist Duo.

## CONCLUSION

For the foregoing reasons, the Court should grant the petition for review and vacate EPA's registration of Enlist Duo. Vacatur should extend not only to EPA's 2017 registration order, but also to the superseded 2014 and 2015 registration orders if those orders would otherwise be reinstated.

Dated: April 11, 2018

Respectfully submitted,

/s/ Margaret T. Hsieh
Margaret T. Hsieh
Mitchell S. Bernard
Kaitlin Morrison
Natural Resources Defense Council
40 West 20th Street
New York, NY 10011
Telephone: (212) 727-2700
Facsimile: (415) 795-4799
mhsieh@nrdc.org
mbernard@nrdc.org
kmorrison@nrdc.org

Peter J. DeMarco
Natural Resources Defense Council
1152 15th Street NW
Suite 300
Washington, DC 20005
Telephone: (202) 289-6868
Facsimile: (415) 795-4799
pdemarco@nrdc.org

*Counsel for Petitioner NRDC*

## STATEMENT OF RELATED CASES

There are no known related cases pending in this Court.

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Cir. R. 32-1(a) because it contains 12,007 words, excluding the parts of the brief exempted by Cir. R. 32-1(c) and Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using 14-point Times New Roman font.

Dated: April 11, 2018

/s/ Margaret T. Hsieh
*Counsel for Petitioner NRDC*

## CERTIFICATE OF SERVICE

I hereby certify that on April 11, 2018, I electronically filed the foregoing brief and the accompanying declarations of Joan Bristol, LeRoy Gruber, Gina Trujillo, and Diane Wetzel with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated: April 11, 2018

/s/ Margaret T. Hsieh
*Counsel for Petitioner NRDC*

## ADDENDUM OF STATUTES AND REGULATIONS

### Table of Contents


7 U.S.C. § 136 .......... ADD 2

7 U.S.C. § 136a .......... ADD 14

7 U.S.C. § 136n .......... ADD 36

40 C.F.R. § 152.44 .......... ADD 38

40 C.F.R. § 152.112 .......... ADD 40

40 C.F.R. § 155.40 .......... ADD 42

40 C.F.R. § 155.42 .......... ADD 44

40 C.F.R. § 155.53 .......... ADD 46

40 C.F.R. § 158.75 .......... ADD 48

United States Code Annotated
Title 7. Agriculture (Refs & Annos)
Chapter 6. Insecticides and Environmental Pesticide Control (Refs & Annos)
Subchapter II. Environmental Pesticide Control (Refs & Annos)

7 U.S.C.A. § 136

§ 136. Definitions

Effective: August 3, 1996
Currentness

For purposes of this subchapter--

**(a) Active ingredient**

The term "active ingredient" means--

**(1)** in the case of a pesticide other than a plant regulator, defoliant, desiccant, or nitrogen stabilizer, an ingredient which will prevent, destroy, repel, or mitigate any pest;

**(2)** in the case of a plant regulator, an ingredient which, through physiological action, will accelerate or retard the rate of growth or rate of maturation or otherwise alter the behavior of ornamental or crop plants or the product thereof;

**(3)** in the case of a defoliant, an ingredient which will cause the leaves or foliage to drop from a plant;

**(4)** in the case of a desiccant, an ingredient which will artificially accelerate the drying of plant tissue; and

**(5)** in the case of a nitrogen stabilizer, an ingredient which will prevent or hinder the process of nitrification, denitrification, ammonia volatilization, or urease production through action affecting soil bacteria.

**(b) Administrator**

The term "Administrator" means the Administrator of the Environmental Protection Agency.

**(c) Adulterated**

The term "adulterated" applies to any pesticide if--

**(1)** its strength or purity falls below the professed standard of quality as expressed on its labeling under which it is sold;


WESTLAW © 2018 Thomson Reuters. No claim to original U.S. Government Works.

**(2)** any substance has been substituted wholly or in part for the pesticide; or

**(3)** any valuable constituent of the pesticide has been wholly or in part abstracted.

**(d) Animal**

The term "animal" means all vertebrate and invertebrate species, including but not limited to man and other mammals, birds, fish, and shellfish.

**(e) Certified applicator, etc.**

**(1) Certified applicator**

The term "certified applicator" means any individual who is certified under section 136i of this title as authorized to use or supervise the use of any pesticide which is classified for restricted use. Any applicator who holds or applies registered pesticides, or uses dilutions of registered pesticides consistent with subsection (ee), only to provide a service of controlling pests without delivering any unapplied pesticide to any person so served is not deemed to be a seller or distributor of pesticides under this subchapter.

**(2) Private applicator**

The term "private applicator" means a certified applicator who uses or supervises the use of any pesticide which is classified for restricted use for purposes of producing any agricultural commodity on property owned or rented by the applicator or the applicator's employer or (if applied without compensation other than trading of personal services between producers of agricultural commodities) on the property of another person.

**(3) Commercial applicator**

The term "commercial applicator" means an applicator (whether or not the applicator is a private applicator with respect to some uses) who uses or supervises the use of any pesticide which is classified for restricted use for any purpose or on any property other than as provided by paragraph (2).

**(4) Under the direct supervision of a certified applicator**

Unless otherwise prescribed by its labeling, a pesticide shall be considered to be applied under the direct supervision of a certified applicator if it is applied by a competent person acting under the instructions and control of a certified applicator who is available if and when needed, even though such certified applicator is not physically present at the time and place the pesticide is applied.

**(f) Defoliant**

The term "defoliant" means any substance or mixture of substances intended for causing the leaves or foliage to drop from a plant, with or without causing abscission.

WESTLAW © 2018 Thomson Reuters. No claim to original U.S. Government Works.

**(g) Desiccant**

The term "desiccant" means any substance or mixture of substances intended for artificially accelerating the drying of plant tissue.

**(h) Device**

The term "device" means any instrument or contrivance (other than a firearm) which is intended for trapping, destroying, repelling, or mitigating any pest or any other form of plant or animal life (other than man and other than bacteria, virus, or other microorganism on or in living man or other living animals); but not including equipment used for the application of pesticides when sold separately therefrom.

**(i) District court**

The term "district court" means a United States district court, the District Court of Guam, the District Court of the Virgin Islands, and the highest court of American Samoa.

**(j) Environment**

The term "environment" includes water, air, land, and all plants and man and other animals living therein, and the interrelationships which exist among these.

**(k) Fungus**

The term "fungus" means any non-chlorophyll-bearing thallophyte (that is, any non-chlorophyll-bearing plant of a lower order than mosses and liverworts), as for example, rust, smut, mildew, mold, yeast, and bacteria, except those on or in living man or other animals and those on or in processed food, beverages, or pharmaceuticals.

**(l) Imminent hazard**

The term "imminent hazard" means a situation which exists when the continued use of a pesticide during the time required for cancellation proceeding would be likely to result in unreasonable adverse effects on the environment or will involve unreasonable hazard to the survival of a species declared endangered or threatened by the Secretary pursuant to the Endangered Species Act of 1973.

**(m) Inert ingredient**

The term "inert ingredient" means an ingredient which is not active.

**(n) Ingredient statement**

The term "ingredient statement" means a statement which contains--

WESTLAW © 2018 Thomson Reuters. No claim to original U.S. Government Works.

**(1)** the name and percentage of each active ingredient, and the total percentage of all inert ingredients, in the pesticide; and

**(2)** if the pesticide contains arsenic in any form, a statement of the percentages of total and water soluble arsenic, calculated as elementary arsenic.

**(o) Insect**

The term "insect" means any of the numerous small invertebrate animals generally having the body more or less obviously segmented, for the most part belonging to the class insecta, comprising six-legged, usually winged forms, as for example, beetles, bugs, bees, flies, and to other allied classes of arthropods whose members are wingless and usually have more than six legs, as for example, spiders, mites, ticks, centipedes, and wood lice.

**(p) Label and labeling**

**(1) Label**

The term "label" means the written, printed, or graphic matter on, or attached to, the pesticide or device or any of its containers or wrappers.

**(2) Labeling**

The term "labeling" means all labels and all other written, printed, or graphic matter--

**(A)** accompanying the pesticide or device at any time; or

**(B)** to which reference is made on the label or in literature accompanying the pesticide or device, except to current official publications of the Environmental Protection Agency, the United States Departments of Agriculture and Interior, the Department of Health and Human Services, State experiment stations, State agricultural colleges, and other similar Federal or State institutions or agencies authorized by law to conduct research in the field of pesticides.

**(q) Misbranded**

**(1)** A pesticide is misbranded if--

**(A)** its labeling bears any statement, design, or graphic representation relative thereto or to its ingredients which is false or misleading in any particular;

**(B)** it is contained in a package or other container or wrapping which does not conform to the standards established by the Administrator pursuant to section 136w(c)(3) of this title;

**(C)** it is an imitation of, or is offered for sale under the name of, another pesticide;

**(D)** its label does not bear the registration number assigned under section 136e of this title to each establishment in which it was produced;

**(E)** any word, statement, or other information required by or under authority of this subchapter to appear on the label or labeling is not prominently placed thereon with such conspicuousness (as compared with other words, statements, designs, or graphic matter in the labeling) and in such terms as to render it likely to be read and understood by the ordinary individual under customary conditions of purchase and use;

**(F)** the labeling accompanying it does not contain directions for use which are necessary for effecting the purpose for which the product is intended and if complied with, together with any requirements imposed under section 136a(d) of this title, are adequate to protect health and the environment;

**(G)** the label does not contain a warning or caution statement which may be necessary and if complied with, together with any requirements imposed under section 136a(d) of this title, is adequate to protect health and the environment; or

**(H)** in the case of a pesticide not registered in accordance with section 136a of this title and intended for export, the label does not contain, in words prominently placed thereon with such conspicuousness (as compared with other words, statements, designs, or graphic matter in the labeling) as to render it likely to be noted by the ordinary individual under customary conditions of purchase and use, the following: "Not Registered for Use in the United States of America".

**(2)** A pesticide is misbranded if--

**(A)** the label does not bear an ingredient statement on that part of the immediate container (and on the outside container or wrapper of the retail package, if there be one, through which the ingredient statement on the immediate container cannot be clearly read) which is presented or displayed under customary conditions of purchase, except that a pesticide is not misbranded under this subparagraph if--

**(i)** the size or form of the immediate container, or the outside container or wrapper of the retail package, makes it impracticable to place the ingredient statement on the part which is presented or displayed under customary conditions of purchase; and

**(ii)** the ingredient statement appears prominently on another part of the immediate container, or outside container or wrapper, permitted by the Administrator;

**(B)** the labeling does not contain a statement of the use classification under which the product is registered;

**(C)** there is not affixed to its container, and to the outside container or wrapper of the retail package, if there be one, through which the required information on the immediate container cannot be clearly read, a label bearing--

**(i)** the name and address of the producer, registrant, or person for whom produced;

**(ii)** the name, brand, or trademark under which the pesticide is sold;

**(iii)** the net weight or measure of the content, except that the Administrator may permit reasonable variations; and

**(iv)** when required by regulation of the Administrator to effectuate the purposes of this subchapter, the registration number assigned to the pesticide under this subchapter, and the use classification; and

**(D)** the pesticide contains any substance or substances in quantities highly toxic to man, unless the label shall bear, in addition to any other matter required by this subchapter--

**(i)** the skull and crossbones;

**(ii)** the word "poison" prominently in red on a background of distinctly contrasting color; and

**(iii)** a statement of a practical treatment (first aid or otherwise) in case of poisoning by the pesticide.

**(r) Nematode**

The term "nematode" means invertebrate animals of the phylum nemathelminthes and class nematoda, that is, unsegmented round worms with elongated, fusiform, or saclike bodies covered with cuticle, and inhabiting soil, water, plants, or plant parts; may also be called nemas or eelworms.

**(s) Person**

The term "person" means any individual, partnership, association, corporation, or any organized group of persons whether incorporated or not.

**(t) Pest**

The term "pest" means (1) any insect, rodent, nematode, fungus, weed, or (2) any other form of terrestrial or aquatic plant or animal life or virus, bacteria, or other micro-organism (except viruses, bacteria, or other micro-organisms on or in living man or other living animals) which the Administrator declares to be a pest under section 136w(c)(1) of this title.

**(u) Pesticide**

WESTLAW © 2018 Thomson Reuters. No claim to original U.S. Government Works.

The term "pesticide" means (1) any substance or mixture of substances intended for preventing, destroying, repelling, or mitigating any pest, (2) any substance or mixture of substances intended for use as a plant regulator, defoliant, or desiccant, and (3) any nitrogen stabilizer, except that the term "pesticide" shall not include any article that is a "new animal drug" within the meaning of section 321(w) of Title 21, that has been determined by the Secretary of Health and Human Services not to be a new animal drug by a regulation establishing conditions of use for the article, or that is an animal feed within the meaning of section 321(x) of Title 21 bearing or containing a new animal drug. The term "pesticide" does not include liquid chemical sterilant products (including any sterilant or subordinate disinfectant claims on such products) for use on a critical or semi-critical device, as defined in section 321 of Title 21. For purposes of the preceding sentence, the term "critical device" includes any device which is introduced directly into the human body, either into or in contact with the bloodstream or normally sterile areas of the body and the term "semi-critical device" includes any device which contacts intact mucous membranes but which does not ordinarily penetrate the blood barrier or otherwise enter normally sterile areas of the body.

**(v) Plant regulator**

The term "plant regulator" means any substance or mixture of substances intended, through physiological action, for accelerating or retarding the rate of growth or rate of maturation, or for otherwise altering the behavior of plants or the produce thereof, but shall not include substances to the extent that they are intended as plant nutrients, trace elements, nutritional chemicals, plant inoculants, and soil amendments. Also, the term "plant regulator" shall not be required to include any of such of those nutrient mixtures or soil amendments as are commonly known as vitamin-hormone horticultural products, intended for improvement, maintenance, survival, health, and propagation of plants, and as are not for pest destruction and are nontoxic, nonpoisonous in the undiluted packaged concentration.

**(w) Producer and produce**

The term "producer" means the person who manufactures, prepares, compounds, propagates, or processes any pesticide or device or active ingredient used in producing a pesticide. The term "produce" means to manufacture, prepare, compound, propagate, or process any pesticide or device or active ingredient used in producing a pesticide. The dilution by individuals of formulated pesticides for their own use and according to the directions on registered labels shall not of itself result in such individuals being included in the definition of "producer" for the purposes of this subchapter.

**(x) Protect health and the environment**

The terms "protect health and the environment" and "protection of health and the environment" mean protection against any unreasonable adverse effects on the environment.

**(y) Registrant**

The term "registrant" means a person who has registered any pesticide pursuant to the provisions of this subchapter.

**(z) Registration**

The term "registration" includes reregistration.

**(aa) State**

The term "State" means a State, the District of Columbia, the Commonwealth of Puerto Rico, the Virgin Islands, Guam, the Trust Territory of the Pacific Islands, and American Samoa.

**(bb) Unreasonable adverse effects on the environment**

The term "unreasonable adverse effects on the environment" means (1) any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide, or (2) a human dietary risk from residues that result from a use of a pesticide in or on any food inconsistent with the standard under section 346a of Title 21. The Administrator shall consider the risks and benefits of public health pesticides separate from the risks and benefits of other pesticides. In weighing any regulatory action concerning a public health pesticide under this subchapter, the Administrator shall weigh any risks of the pesticide against the health risks such as the diseases transmitted by the vector to be controlled by the pesticide.

**(cc) Weed**

The term "weed" means any plant which grows where not wanted.

**(dd) Establishment**

The term "establishment" means any place where a pesticide or device or active ingredient used in producing a pesticide is produced, or held, for distribution or sale.

**(ee) To use any registered pesticide in a manner inconsistent with its labeling**

The term "to use any registered pesticide in a manner inconsistent with its labeling" means to use any registered pesticide in a manner not permitted by the labeling, except that the term shall not include (1) applying a pesticide at any dosage, concentration, or frequency less than that specified on the labeling unless the labeling specifically prohibits deviation from the specified dosage, concentration, or frequency, (2) applying a pesticide against any target pest not specified on the labeling if the application is to the crop, animal, or site specified on the labeling, unless the Administrator has required that the labeling specifically state that the pesticide may be used only for the pests specified on the labeling after the Administrator has determined that the use of the pesticide against other pests would cause an unreasonable adverse effect on the environment, (3) employing any method of application not prohibited by the labeling unless the labeling specifically states that the product may be applied only by the methods specified on the labeling, (4) mixing a pesticide or pesticides with a fertilizer when such mixture is not prohibited by the labeling, (5) any use of a pesticide in conformance with section 136c, 136p, or 136v of this title, or (6) any use of a pesticide in a manner that the Administrator determines to be consistent with the purposes of this subchapter. After March 31, 1979, the term shall not include the use of a pesticide for agricultural or forestry purposes at a dilution less than label dosage unless before or after that date the Administrator issues a regulation or advisory opinion consistent with the study provided for in section 27(b) of the Federal Pesticide Act of 1978, which regulation or advisory opinion specifically requires the use of definite amounts of dilution.

**(ff) Outstanding data requirement**

**(1) In general**

WESTLAW © 2018 Thomson Reuters. No claim to original U.S. Government Works.

The term "outstanding data requirement" means a requirement for any study, information, or data that is necessary to make a determination under section 136a(c)(5) of this title and which study, information, or data--

**(A)** has not been submitted to the Administrator; or

**(B)** if submitted to the Administrator, the Administrator has determined must be resubmitted because it is not valid, complete, or adequate to make a determination under section 136a(c)(5) of this title and the regulations and guidelines issued under such section.

**(2) Factors**

In making a determination under paragraph (1)(B) respecting a study, the Administrator shall examine, at a minimum, relevant protocols, documentation of the conduct and analysis of the study, and the results of the study to determine whether the study and the results of the study fulfill the data requirement for which the study was submitted to the Administrator.

**(gg) To distribute or sell**

The term "to distribute or sell" means to distribute, sell, offer for sale, hold for distribution, hold for sale, hold for shipment, ship, deliver for shipment, release for shipment, or receive and (having so received) deliver or offer to deliver. The term does not include the holding or application of registered pesticides or use dilutions thereof by any applicator who provides a service of controlling pests without delivering any unapplied pesticide to any person so served.

**(hh) Nitrogen stabilizer**

The term "nitrogen stabilizer" means any substance or mixture of substances intended for preventing or hindering the process of nitrification, denitrification, ammonia volatilization, or urease production through action upon soil bacteria. Such term shall not include--

**(1)** dicyandiamide;

**(2)** ammonium thiosulfate; or

**(3)** any substance or mixture of substances.[1] --

**(A)** that was not registered pursuant to section 136a of this title prior to January 1, 1992; and

**(B)** that was in commercial agronomic use prior to January 1, 1992, with respect to which after January 1, 1992, the distributor or seller of the substance or mixture has made no specific claim of prevention or hindering of the process of nitrification, denitrification, ammonia volatilization[2] urease production regardless of the actual use or purpose for, or future use or purpose for, the substance or mixture.

 © 2018 Thomson Reuters. No claim to original U.S. Government Works. 

Statements made in materials required to be submitted to any State legislative or regulatory authority, or required by such authority to be included in the labeling or other literature accompanying any such substance or mixture shall not be deemed a specific claim within the meaning of this subsection.

**(jj)** [3] **Maintenance applicator**

The term "maintenance applicator" means any individual who, in the principal course of such individual's employment, uses, or supervises the use of, a pesticide not classified for restricted use (other than a ready to use consumer products pesticide); for the purpose of providing structural pest control or lawn pest control including janitors, general maintenance personnel, sanitation personnel, and grounds maintenance personnel. The term "maintenance applicator" does not include private applicators as defined in subsection (e)(2); individuals who use antimicrobial pesticides, sanitizers or disinfectants; individuals employed by Federal, State, and local governments or any political subdivisions thereof, or individuals who use pesticides not classified for restricted use in or around their homes, boats, sod farms, nurseries, greenhouses, or other noncommercial property.

**(kk) Service technician**

The term "service technician" means any individual who uses or supervises the use of pesticides (other than a ready to use consumer products pesticide) for the purpose of providing structural pest control or lawn pest control on the property of another for a fee. The term "service technician" does not include individuals who use antimicrobial pesticides, sanitizers or disinfectants; or who otherwise apply ready to use consumer products pesticides.

**(ll) Minor use**

The term "minor use" means the use of a pesticide on an animal, on a commercial agricultural crop or site, or for the protection of public health where--

**(1)** the total United States acreage for the crop is less than 300,000 acres, as determined by the Secretary of Agriculture; or

**(2)** the Administrator, in consultation with the Secretary of Agriculture, determines that, based on information provided by an applicant for registration or a registrant, the use does not provide sufficient economic incentive to support the initial registration or continuing registration of a pesticide for such use and--

**(A)** there are insufficient efficacious alternative registered pesticides available for the use;

**(B)** the alternatives to the pesticide use pose greater risks to the environment or human health;

**(C)** the minor use pesticide plays or will play a significant part in managing pest resistance; or

**(D)** the minor use pesticide plays or will play a significant part in an integrated pest management program.

 © 2018 Thomson Reuters. No claim to original U.S. Government Works. 

The status as a minor use under this subsection shall continue as long as the Administrator has not determined that, based on existing data, such use may cause an unreasonable adverse effect on the environment and the use otherwise qualifies for such status.

**(mm) Antimicrobial pesticide**

**(1) In general**

The term "antimicrobial pesticide" means a pesticide that--

**(A)** is intended to--

**(i)** disinfect, sanitize, reduce, or mitigate growth or development of microbiological organisms; or

**(ii)** protect inanimate objects, industrial processes or systems, surfaces, water, or other chemical substances from contamination, fouling, or deterioration caused by bacteria, viruses, fungi, protozoa, algae, or slime; and

**(B)** in the intended use is exempt from, or otherwise not subject to, a tolerance under section 346a of Title 21 or a food additive regulation under section 348 of Title 21.

**(2) Excluded products**

The term "antimicrobial pesticide" does not include--

**(A)** a wood preservative or antifouling paint product for which a claim of pesticidal activity other than or in addition to an activity described in paragraph (1) is made;

**(B)** an agricultural fungicide product; or

**(C)** an aquatic herbicide product.

**(3) Included products**

The term "antimicrobial pesticide" does include any other chemical sterilant product (other than liquid chemical sterilant products exempt under subsection (u)), any other disinfectant product, any other industrial microbiocide product, and any other preservative product that is not excluded by paragraph (2).

**(nn) Public health pesticide**

The term "public health pesticide" means any minor use pesticide product registered for use and used predominantly in public health programs for vector control or for other recognized health protection uses, including the prevention or mitigation of viruses, bacteria, or other microorganisms (other than viruses, bacteria, or other microorganisms on or in living man or other living animal) that pose a threat to public health.

**(oo) Vector**

The term "vector" means any organism capable of transmitting the causative agent of human disease or capable of producing human discomfort or injury, including mosquitoes, flies, fleas, cockroaches, or other insects and ticks, mites, or rats.

**CREDIT(S)**

(June 25, 1947, c. 125, § 2, as added Pub.L. 92-516, § 2, Oct. 21, 1972, 86 Stat. 975; amended Pub.L. 93-205, § 13(f), Dec. 28, 1973, 87 Stat. 903; Pub.L. 94-140, § 9, Nov. 28, 1975, 89 Stat. 754; Pub.L. 95-396, § 1, Sept. 30, 1978, 92 Stat. 819; Pub.L. 100-532, Title I, § 101, Title VI, § 601(a), Title VIII, § 801(a), Oct. 25, 1988, 102 Stat. 2655, 2677, 2679; Pub.L. 102-237, Title X, § 1006(a)(1), (2), (b)(3)(A), (B), Dec. 13, 1991, 105 Stat. 1894, 1895; Pub.L. 104-170, Title I, §§ 105(a), 120, Title II, §§ 210(a), 221, 230, Title III, § 304, Aug. 3, 1996, 110 Stat. 1490, 1492, 1493, 1502, 1508, 1512.)

Notes of Decisions (9)

Footnotes

1 So in original. Probably should not have a period.

2 So in original. Probably should be followed by ", or".

3 So in original. No subsec. (ii) has been enacted.

7 U.S.C.A. § 136, 7 USCA § 136

Current through P.L. 115-140.

End of Document © 2018 Thomson Reuters. No claim to original U.S. Government Works.

United States Code Annotated
Title 7. Agriculture (Refs & Annos)
Chapter 6. Insecticides and Environmental Pesticide Control (Refs & Annos)
Subchapter II. Environmental Pesticide Control (Refs & Annos)

7 U.S.C.A. § 136a

§ 136a. Registration of pesticides

Currentness

**(a) Requirement of registration**

Except as provided by this subchapter, no person in any State may distribute or sell to any person any pesticide that is not registered under this subchapter. To the extent necessary to prevent unreasonable adverse effects on the environment, the Administrator may by regulation limit the distribution, sale, or use in any State of any pesticide that is not registered under this subchapter and that is not the subject of an experimental use permit under section 136c of this title or an emergency exemption under section 136p of this title.

**(b) Exemptions**

A pesticide which is not registered with the Administrator may be transferred if--

**(1)** the transfer is from one registered establishment to another registered establishment operated by the same producer solely for packaging at the second establishment or for use as a constituent part of another pesticide produced at the second establishment; or

**(2)** the transfer is pursuant to and in accordance with the requirements of an experimental use permit.

**(c) Procedure for registration**

**(1) Statement required**

Each applicant for registration of a pesticide shall file with the Administrator a statement which includes--

**(A)** the name and address of the applicant and of any other person whose name will appear on the labeling;

**(B)** the name of the pesticide;

**(C)** a complete copy of the labeling of the pesticide, a statement of all claims to be made for it, and any directions for its use;

**(D)** the complete formula of the pesticide;

**(E)** a request that the pesticide be classified for general use or for restricted use, or for both; and

**(F)** except as otherwise provided in paragraph (2)(D), if requested by the Administrator, a full description of the tests made and the results thereof upon which the claims are based, or alternatively a citation to data that appear in the public literature or that previously had been submitted to the Administrator and that the Administrator may consider in accordance with the following provisions:

**(i)** With respect to pesticides containing active ingredients that are initially registered under this subchapter after September 30, 1978, data submitted to support the application for the original registration of the pesticide, or an application for an amendment adding any new use to the registration and that pertains solely to such new use, shall not, without the written permission of the original data submitter, be considered by the Administrator to support an application by another person during a period of ten years following the date the Administrator first registers the pesticide, except that such permission shall not be required in the case of defensive data.

**(ii)** The period of exclusive data use provided under clause (i) shall be extended 1 additional year for each 3 minor uses registered after August 3, 1996, and within 7 years of the commencement of the exclusive use period, up to a total of 3 additional years for all minor uses registered by the Administrator if the Administrator, in consultation with the Secretary of Agriculture, determines that, based on information provided by an applicant for registration or a registrant, that--

**(I)** there are insufficient efficacious alternative registered pesticides available for the use;

**(II)** the alternatives to the minor use pesticide pose greater risks to the environment or human health;

**(III)** the minor use pesticide plays or will play a significant part in managing pest resistance; or

**(IV)** the minor use pesticide plays or will play a significant part in an integrated pest management program.

The registration of a pesticide for a minor use on a crop grouping established by the Administrator shall be considered for purposes of this clause 1 minor use for each representative crop for which data are provided in the crop grouping. Any additional exclusive use period under this clause shall be modified as appropriate or terminated if the registrant voluntarily cancels the product or deletes from the registration the minor uses which formed the basis for the extension of the additional exclusive use period or if the Administrator determines that the registrant is not actually marketing the product for such minor uses.

**(iii)** Except as otherwise provided in clause (i), with respect to data submitted after December 31, 1969, by an applicant or registrant to support an application for registration, experimental use permit, or amendment adding a new use to an existing registration, to support or maintain in effect an existing registration, or for reregistration, the Administrator may, without the permission of the original data submitter, consider any such item of data in support of an application by any other person (hereinafter in this subparagraph referred to as the "applicant")

within the fifteen-year period following the date the data were originally submitted only if the applicant has made an offer to compensate the original data submitter and submitted such offer to the Administrator accompanied by evidence of delivery to the original data submitter of the offer. The terms and amount of compensation may be fixed by agreement between the original data submitter and the applicant, or, failing such agreement, binding arbitration under this subparagraph. If, at the end of ninety days after the date of delivery to the original data submitter of the offer to compensate, the original data submitter and the applicant have neither agreed on the amount and terms of compensation nor on a procedure for reaching an agreement on the amount and terms of compensation, either person may initiate binding arbitration proceedings by requesting the Federal Mediation and Conciliation Service to appoint an arbitrator from the roster of arbitrators maintained by such Service. The procedure and rules of the Service shall be applicable to the selection of such arbitrator and to such arbitration proceedings, and the findings and determination of the arbitrator shall be final and conclusive, and no official or court of the United States shall have power or jurisdiction to review any such findings and determination, except for fraud, misrepresentation, or other misconduct by one of the parties to the arbitration or the arbitrator where there is a verified complaint with supporting affidavits attesting to specific instances of such fraud, misrepresentation, or other misconduct. The parties to the arbitration shall share equally in the payment of the fee and expenses of the arbitrator. If the Administrator determines that an original data submitter has failed to participate in a procedure for reaching an agreement or in an arbitration proceeding as required by this subparagraph, or failed to comply with the terms of an agreement or arbitration decision concerning compensation under this subparagraph, the original data submitter shall forfeit the right to compensation for the use of the data in support of the application. Notwithstanding any other provision of this subchapter, if the Administrator determines that an applicant has failed to participate in a procedure for reaching an agreement or in an arbitration proceeding as required by this subparagraph, or failed to comply with the terms of an agreement or arbitration decision concerning compensation under this subparagraph, the Administrator shall deny the application or cancel the registration of the pesticide in support of which the data were used without further hearing. Before the Administrator takes action under either of the preceding two sentences, the Administrator shall furnish to the affected person, by certified mail, notice of intent to take action and allow fifteen days from the date of delivery of the notice for the affected person to respond. If a registration is denied or canceled under this subparagraph, the Administrator may make such order as the Administrator deems appropriate concerning the continued sale and use of existing stocks of such pesticide. Registration action by the Administrator shall not be delayed pending the fixing of compensation.

**(iv)** After expiration of any period of exclusive use and any period for which compensation is required for the use of an item of data under clauses (i), (ii), and (iii), the Administrator may consider such item of data in support of an application by any other applicant without the permission of the original data submitter and without an offer having been received to compensate the original data submitter for the use of such item of data.

**(v)** The period of exclusive use provided under clause (ii) shall not take effect until 1 year after August 3, 1996, except where an applicant or registrant is applying for the registration of a pesticide containing an active ingredient not previously registered.

**(vi)** With respect to data submitted after August 3, 1996, by an applicant or registrant to support an amendment adding a new use to an existing registration that does not retain any period of exclusive use, if such data relates solely to a minor use of a pesticide, such data shall not, without the written permission of the original data submitter, be considered by the Administrator to support an application for a minor use by another person during the period of 10 years following the date of submission of such data. The applicant or registrant at the time the new minor use is requested shall notify the Administrator that to the best of their knowledge the exclusive use period for the pesticide has expired and that the data pertaining solely to the minor use of a pesticide is eligible

for the provisions of this paragraph. If the minor use registration which is supported by data submitted pursuant to this subsection is voluntarily canceled or if such data are subsequently used to support a nonminor use, the data shall no longer be subject to the exclusive use provisions of this clause but shall instead be considered by the Administrator in accordance with the provisions of clause (i), as appropriate.

**(G)** If the applicant is requesting that the registration or amendment to the registration of a pesticide be expedited, an explanation of the basis for the request must be submitted, in accordance with paragraph (10) of this subsection.

**(2) Data in support of registration**

**(A) In general**

The Administrator shall publish guidelines specifying the kinds of information which will be required to support the registration of a pesticide and shall revise such guidelines from time to time. If thereafter the Administrator requires any additional kind of information under subparagraph (B) of this paragraph, the Administrator shall permit sufficient time for applicants to obtain such additional information. The Administrator, in establishing standards for data requirements for the registration of pesticides with respect to minor uses, shall make such standards commensurate with the anticipated extent of use, pattern of use, the public health and agricultural need for such minor use, and the level and degree of potential beneficial or adverse effects on man and the environment. The Administrator shall not require a person to submit, in relation to a registration or reregistration of a pesticide for minor agricultural use under this subchapter, any field residue data from a geographic area where the pesticide will not be registered for such use. In the development of these standards, the Administrator shall consider the economic factors of potential national volume of use, extent of distribution, and the impact of the cost of meeting the requirements on the incentives for any potential registrant to undertake the development of the required data. Except as provided by section 136h of this title, within 30 days after the Administrator registers a pesticide under this subchapter the Administrator shall make available to the public the data called for in the registration statement together with such other scientific information as the Administrator deems relevant to the Administrator's decision.

**(B) Additional data**

**(i)** If the Administrator determines that additional data are required to maintain in effect an existing registration of a pesticide, the Administrator shall notify all existing registrants of the pesticide to which the determination relates and provide a list of such registrants to any interested person.

**(ii)** Each registrant of such pesticide shall provide evidence within ninety days after receipt of notification that it is taking appropriate steps to secure the additional data that are required. Two or more registrants may agree to develop jointly, or to share in the cost of developing, such data if they agree and advise the Administrator of their intent within ninety days after notification. Any registrant who agrees to share in the cost of producing the data shall be entitled to examine and rely upon such data in support of maintenance of such registration. The Administrator shall issue a notice of intent to suspend the registration of a pesticide in accordance with the procedures prescribed by clause (iv) if a registrant fails to comply with this clause.

**(iii)** If, at the end of sixty days after advising the Administrator of their agreement to develop jointly, or share in the cost of developing, data, the registrants have not further agreed on the terms of the data development arrangement

or on a procedure for reaching such agreement, any of such registrants may initiate binding arbitration proceedings by requesting the Federal Mediation and Conciliation Service to appoint an arbitrator from the roster of arbitrators maintained by such Service. The procedure and rules of the Service shall be applicable to the selection of such arbitrator and to such arbitration proceedings, and the findings and determination of the arbitrator shall be final and conclusive, and no official or court of the United States shall have power or jurisdiction to review any such findings and determination, except for fraud, misrepresentation, or other misconduct by one of the parties to the arbitration or the arbitrator where there is a verified complaint with supporting affidavits attesting to specific instances of such fraud, misrepresentation, or other misconduct. All parties to the arbitration shall share equally in the payment of the fee and expenses of the arbitrator. The Administrator shall issue a notice of intent to suspend the registration of a pesticide in accordance with the procedures prescribed by clause (iv) if a registrant fails to comply with this clause.

**(iv)** Notwithstanding any other provision of this subchapter, if the Administrator determines that a registrant, within the time required by the Administrator, has failed to take appropriate steps to secure the data required under this subparagraph, to participate in a procedure for reaching agreement concerning a joint data development arrangement under this subparagraph or in an arbitration proceeding as required by this subparagraph, or to comply with the terms of an agreement or arbitration decision concerning a joint data development arrangement under this subparagraph, the Administrator may issue a notice of intent to suspend such registrant's registration of the pesticide for which additional data is required. The Administrator may include in the notice of intent to suspend such provisions as the Administrator deems appropriate concerning the continued sale and use of existing stocks of such pesticide. Any suspension proposed under this subparagraph shall become final and effective at the end of thirty days from receipt by the registrant of the notice of intent to suspend, unless during that time a request for hearing is made by a person adversely affected by the notice or the registrant has satisfied the Administrator that the registrant has complied fully with the requirements that served as a basis for the notice of intent to suspend. If a hearing is requested, a hearing shall be conducted under section 136d(d) of this title. The only matters for resolution at that hearing shall be whether the registrant has failed to take the action that served as the basis for the notice of intent to suspend the registration of the pesticide for which additional data is required, and whether the Administrator's determination with respect to the disposition of existing stocks is consistent with this subchapter. If a hearing is held, a decision after completion of such hearing shall be final. Notwithstanding any other provision of this subchapter, a hearing shall be held and a determination made within seventy-five days after receipt of a request for such hearing. Any registration suspended under this subparagraph shall be reinstated by the Administrator if the Administrator determines that the registrant has complied fully with the requirements that served as a basis for the suspension of the registration.

**(v)** Any data submitted under this subparagraph shall be subject to the provisions of paragraph (1)(D). Whenever such data are submitted jointly by two or more registrants, an agent shall be agreed on at the time of the joint submission to handle any subsequent data compensation matters for the joint submitters of such data.

**(vi)** Upon the request of a registrant the Administrator shall, in the case of a minor use, extend the deadline for the production of residue chemistry data under this subparagraph for data required solely to support that minor use until the final deadline for submission of data under section 136a-1 of this title for the other uses of the pesticide established as of August 3, 1996, if--

**(I)** the data to support other uses of the pesticide on a food are being provided;

**(II)** the registrant, in submitting a request for such an extension, provides a schedule, including interim dates to measure progress, to assure that the data production will be completed before the expiration of the extension period;

**(III)** the Administrator has determined that such extension will not significantly delay the Administrator's schedule for issuing a reregistration eligibility determination required under section 136a-1 of this title; and

**(IV)** the Administrator has determined that based on existing data, such extension would not significantly increase the risk of any unreasonable adverse effect on the environment. If the Administrator grants an extension under this clause, the Administrator shall monitor the development of the data and shall ensure that the registrant is meeting the schedule for the production of the data. If the Administrator determines that the registrant is not meeting or has not met the schedule for the production of such data, the Administrator may proceed in accordance with clause (iv) regarding the continued registration of the affected products with the minor use and shall inform the public of such action. Notwithstanding the provisions of this clause, the Administrator may take action to modify or revoke the extension under this clause if the Administrator determines that the extension for the minor use may cause an unreasonable adverse effect on the environment. In such circumstance, the Administrator shall provide, in writing to the registrant, a notice revoking the extension of time for submission of data. Such data shall instead be due in accordance with the date established by the Administrator for the submission of the data.

**(vii)** If the registrant does not commit to support a specific minor use of the pesticide, but is supporting and providing data in a timely and adequate fashion to support uses of the pesticide on a food, or if all uses of the pesticide are nonfood uses and the registrant does not commit to support a specific minor use of the pesticide but is supporting and providing data in a timely and adequate fashion to support other nonfood uses of the pesticide, the Administrator, at the written request of the registrant, shall not take any action pursuant to this clause in regard to such unsupported minor use until the final deadline established as of August 3, 1996, for the submission of data under section 136a-1 of this title for the supported uses identified pursuant to this clause unless the Administrator determines that the absence of the data is significant enough to cause human health or environmental concerns. On the basis of such determination, the Administrator may refuse the request for extension by the registrant. Upon receipt of the request from the registrant, the Administrator shall publish in the Federal Register a notice of the receipt of the request and the effective date upon which the uses not being supported will be voluntarily deleted from the registration pursuant to section 136d(f)(1) of this title. If the Administrator grants an extension under this clause, the Administrator shall monitor the development of the data for the uses being supported and shall ensure that the registrant is meeting the schedule for the production of such data. If the Administrator determines that the registrant is not meeting or has not met the schedule for the production of such data, the Administrator may proceed in accordance with clause (iv) of this subparagraph regarding the continued registration of the affected products with the minor and other uses and shall inform the public of such action in accordance with section 136d(f)(2) of this title. Notwithstanding the provisions of this clause, the Administrator may deny, modify, or revoke the temporary extension under this subparagraph if the Administrator determines that the continuation of the minor use may cause an unreasonable adverse effect on the environment. In the event of modification or revocation, the Administrator shall provide, in writing, to the registrant a notice revoking the temporary extension and establish a new effective date by which the minor use shall be deleted from the registration.

**(viii)(I)** If data required to support registration of a pesticide under subparagraph (A) is requested by a Federal or State regulatory authority, the Administrator shall, to the extent practicable, coordinate data requirements, test protocols, timetables, and standards of review and reduce burdens and redundancy caused to the registrant by multiple requirements on the registrant.

**(II)** The Administrator may enter into a cooperative agreement with a State to carry out subclause (I).

**(III)** Not later than 1 year after August 3, 1996, the Administrator shall develop a process to identify and assist in alleviating future disparities between Federal and State data requirements.

**(C) Simplified procedures**

Within nine months after September 30, 1978, the Administrator shall, by regulation, prescribe simplified procedures for the registration of pesticides, which shall include the provisions of subparagraph (D) of this paragraph.

**(D) Exemption**

No applicant for registration of a pesticide who proposes to purchase a registered pesticide from another producer in order to formulate such purchased pesticide into the pesticide that is the subject of the application shall be required to--

**(i)** submit or cite data pertaining to such purchased product; or

**(ii)** offer to pay reasonable compensation otherwise required by paragraph (1)(D) of this subsection for the use of any such data.

**(E) Minor use waiver**

In handling the registration of a pesticide for a minor use, the Administrator may waive otherwise applicable data requirements if the Administrator determines that the absence of such data will not prevent the Administrator from determining--

**(i)** the incremental risk presented by the minor use of the pesticide; and

**(ii)** that such risk, if any, would not be an unreasonable adverse effect on the environment.

**(3) Application**

**(A) In general**

The Administrator shall review the data after receipt of the application and shall, as expeditiously as possible, either register the pesticide in accordance with paragraph (5), or notify the applicant of the Administrator's determination that it does not comply with the provisions of the subchapter in accordance with paragraph (6).

 © 2018 Thomson Reuters. No claim to original U.S. Government Works. 

**(B) Identical or substantially similar**

**(i)** The Administrator shall, as expeditiously as possible, review and act on any application received by the Administrator that--

**(I)** proposes the initial or amended registration of an end-use pesticide that, if registered as proposed, would be identical or substantially similar in composition and labeling to a currently-registered pesticide identified in the application, or that would differ in composition and labeling from such currently-registered pesticide only in ways that would not significantly increase the risk of unreasonable adverse effects on the environment; or

**(II)** proposes an amendment to the registration of a registered pesticide that does not require scientific review of data.

**(ii)** In expediting the review of an application for an action described in clause (i), the Administrator shall--

**(I)** review the application in accordance with section 136w-8(f)(4)(B) of this title and, if the application is found to be incomplete, reject the application;

**(II)** not later than the applicable decision review time established pursuant to section 136w-8(f)(4)(B) of this title, or, if no review time is established, not later than 90 days after receiving a complete application, notify the registrant if the application has been granted or denied; and

**(III)** if the application is denied, notify the registrant in writing of the specific reasons for the denial of the application.

**(C) Minor use registration**

**(i)** The Administrator shall, as expeditiously as possible, review and act on any complete application--

**(I)** that proposes the initial registration of a new pesticide active ingredient if the active ingredient is proposed to be registered solely for minor uses, or proposes a registration amendment solely for minor uses to an existing registration; or

**(II)** for a registration or a registration amendment that proposes significant minor uses.

**(ii)** For the purposes of clause (i)--

**(I)** the term "as expeditiously as possible" means that the Administrator shall, to the greatest extent practicable, complete a review and evaluation of all data, submitted with a complete application, within 12 months after

the submission of the complete application, and the failure of the Administrator to complete such a review and evaluation under clause (i) shall not be subject to judicial review; and

**(II)** the term "significant minor uses" means 3 or more minor uses proposed for every nonminor use, a minor use that would, in the judgment of the Administrator, serve as a replacement for any use which has been canceled in the 5 years preceding the receipt of the application, or a minor use that in the opinion of the Administrator would avoid the reissuance of an emergency exemption under section 136p of this title for that minor use.

**(D) Adequate time for submission of minor use data**

If a registrant makes a request for a minor use waiver, regarding data required by the Administrator, pursuant to paragraph (2)(E), and if the Administrator denies in whole or in part such data waiver request, the registrant shall have a full-time period for providing such data. For purposes of this subparagraph, the term "full-time period" means the time period originally established by the Administrator for submission of such data, beginning with the date of receipt by the registrant of the Administrator's notice of denial.

**(4) Notice of application**

The Administrator shall publish in the Federal Register, promptly after receipt of the statement and other data required pursuant to paragraphs (1) and (2), a notice of each application for registration of any pesticide if it contains any new active ingredient or if it would entail a changed use pattern. The notice shall provide for a period of 30 days in which any Federal agency or any other interested person may comment.

**(5) Approval of registration**

The Administrator shall register a pesticide if the Administrator determines that, when considered with any restrictions imposed under subsection (d)--

**(A)** its composition is such as to warrant the proposed claims for it;

**(B)** its labeling and other material required to be submitted comply with the requirements of this subchapter;

**(C)** it will perform its intended function without unreasonable adverse effects on the environment; and

**(D)** when used in accordance with widespread and commonly recognized practice it will not generally cause unreasonable adverse effects on the environment.

The Administrator shall not make any lack of essentiality a criterion for denying registration of any pesticide. Where two pesticides meet the requirements of this paragraph, one should not be registered in preference to the other. In considering an application for the registration of a pesticide, the Administrator may waive data requirements pertaining to efficacy, in which event the Administrator may register the pesticide without determining that the pesticide's composition is such as to warrant proposed claims of efficacy. If a pesticide is found to be efficacious by

WESTLAW © 2018 Thomson Reuters. No claim to original U.S. Government Works.

any State under section 136v(c) of this title, a presumption is established that the Administrator shall waive data requirements pertaining to efficacy for use of the pesticide in such State.

**(6) Denial of registration**

If the Administrator determines that the requirements of paragraph (5) for registration are not satisfied, the Administrator shall notify the applicant for registration of the Administrator's determination and of the Administrator's reasons (including the factual basis) therefor, and that, unless the applicant corrects the conditions and notifies the Administrator thereof during the 30-day period beginning with the day after the date on which the applicant receives the notice, the Administrator may refuse to register the pesticide. Whenever the Administrator refuses to register a pesticide, the Administrator shall notify the applicant of the Administrator's decision and of the Administrator's reasons (including the factual basis) therefor. The Administrator shall promptly publish in the Federal Register notice of such denial of registration and the reasons therefor. Upon such notification, the applicant for registration or other interested person with the concurrence of the applicant shall have the same remedies as provided for in section 136d of this title.

**(7) Registration under special circumstances**

Notwithstanding the provisions of paragraph (5)--

**(A)** The Administrator may conditionally register or amend the registration of a pesticide if the Administrator determines that (i) the pesticide and proposed use are identical or substantially similar to any currently registered pesticide and use thereof, or differ only in ways that would not significantly increase the risk of unreasonable adverse effects on the environment, and (ii) approving the registration or amendment in the manner proposed by the applicant would not significantly increase the risk of any unreasonable adverse effect on the environment. An applicant seeking conditional registration or amended registration under this subparagraph shall submit such data as would be required to obtain registration of a similar pesticide under paragraph (5). If the applicant is unable to submit an item of data because it has not yet been generated, the Administrator may register or amend the registration of the pesticide under such conditions as will require the submission of such data not later than the time such data are required to be submitted with respect to similar pesticides already registered under this subchapter.

**(B)** The Administrator may conditionally amend the registration of a pesticide to permit additional uses of such pesticide notwithstanding that data concerning the pesticide may be insufficient to support an unconditional amendment, if the Administrator determines that (i) the applicant has submitted satisfactory data pertaining to the proposed additional use, and (ii) amending the registration in the manner proposed by the applicant would not significantly increase the risk of any unreasonable adverse effect on the environment. Notwithstanding the foregoing provisions of this subparagraph, no registration of a pesticide may be amended to permit an additional use of such pesticide if the Administrator has issued a notice stating that such pesticide, or any ingredient thereof, meets or exceeds risk criteria associated in whole or in part with human dietary exposure enumerated in regulations issued under this subchapter, and during the pendency of any risk-benefit evaluation initiated by such notice, if (I) the additional use of such pesticide involves a major food or feed crop, or (II) the additional use of such pesticide involves a minor food or feed crop and the Administrator determines, with the concurrence of the Secretary of Agriculture, there is available an effective alternative pesticide that does not meet or exceed such risk criteria. An applicant seeking amended registration under this subparagraph shall submit such data as would be required to obtain registration of a similar pesticide under paragraph (5). If the applicant is unable to submit an item of data (other than data pertaining to the proposed additional use) because it has not yet been generated, the Administrator

may amend the registration under such conditions as will require the submission of such data not later than the time such data are required to be submitted with respect to similar pesticides already registered under this subchapter.

**(C)** The Administrator may conditionally register a pesticide containing an active ingredient not contained in any currently registered pesticide for a period reasonably sufficient for the generation and submission of required data (which are lacking because a period reasonably sufficient for generation of the data has not elapsed since the Administrator first imposed the data requirement) on the condition that by the end of such period the Administrator receives such data and the data do not meet or exceed risk criteria enumerated in regulations issued under this subchapter, and on such other conditions as the Administrator may prescribe. A conditional registration under this subparagraph shall be granted only if the Administrator determines that use of the pesticide during such period will not cause any unreasonable adverse effect on the environment, and that use of the pesticide is in the public interest.

**(8) Interim administrative review**

Notwithstanding any other provision of this subchapter, the Administrator may not initiate a public interim administrative review process to develop a risk-benefit evaluation of the ingredients of a pesticide or any of its uses prior to initiating a formal action to cancel, suspend, or deny registration of such pesticide, required under this subchapter, unless such interim administrative process is based on a validated test or other significant evidence raising prudent concerns of unreasonable adverse risk to man or to the environment. Notice of the definition of the terms "validated test" and "other significant evidence" as used herein shall be published by the Administrator in the Federal Register.

**(9) Labeling**

**(A) Additional statements**

Subject to subparagraphs (B) and (C), it shall not be a violation of this subchapter for a registrant to modify the labeling of an antimicrobial pesticide product to include relevant information on product efficacy, product composition, container composition or design, or other characteristics that do not relate to any pesticidal claim or pesticidal activity.

**(B) Requirements**

Proposed labeling information under subparagraph (A) shall not be false or misleading, shall not conflict with or detract from any statement required by law or the Administrator as a condition of registration, and shall be substantiated on the request of the Administrator.

**(C) Notification and disapproval**

**(i) Notification**

A registration may be modified under subparagraph (A) if--

 © 2018 Thomson Reuters. No claim to original U.S. Government Works. 

**(I)** the registrant notifies the Administrator in writing not later than 60 days prior to distribution or sale of a product bearing the modified labeling; and

**(II)** the Administrator does not disapprove of the modification under clause (ii).

**(ii) Disapproval**

Not later than 30 days after receipt of a notification under clause (i), the Administrator may disapprove the modification by sending the registrant notification in writing stating that the proposed language is not acceptable and stating the reasons why the Administrator finds the proposed modification unacceptable.

**(iii) Restriction on sale**

A registrant may not sell or distribute a product bearing a disapproved modification.

**(iv) Objection**

A registrant may file an objection in writing to a disapproval under clause (ii) not later than 30 days after receipt of notification of the disapproval.

**(v) Final action**

A decision by the Administrator following receipt and consideration of an objection filed under clause (iv) shall be considered a final agency action.

**(D) Use dilution**

The label or labeling required under this subchapter for an antimicrobial pesticide that is or may be diluted for use may have a different statement of caution or protective measures for use of the recommended diluted solution of the pesticide than for use of a concentrate of the pesticide if the Administrator determines that--

**(i)** adequate data have been submitted to support the statement proposed for the diluted solution uses; and

**(ii)** the label or labeling provides adequate protection for exposure to the diluted solution of the pesticide.

**(10) Expedited registration of pesticides**

**(A)** Not later than 1 year after August 3, 1996, the Administrator shall, utilizing public comment, develop procedures and guidelines, and expedite the review of an application for registration of a pesticide or an amendment to a registration that satisfies such guidelines.

**(B)** Any application for registration or an amendment, including biological and conventional pesticides, will be considered for expedited review under this paragraph. An application for registration or an amendment shall qualify for expedited review if use of the pesticide proposed by the application may reasonably be expected to accomplish 1 or more of the following:

**(i)** Reduce the risks of pesticides to human health.

**(ii)** Reduce the risks of pesticides to nontarget organisms.

**(iii)** Reduce the potential for contamination of groundwater, surface water, or other valued environmental resources.

**(iv)** Broaden the adoption of integrated pest management strategies, or make such strategies more available or more effective.

**(C)** The Administrator, not later than 30 days after receipt of an application for expedited review, shall notify the applicant whether the application is complete. If it is found to be incomplete, the Administrator may either reject the request for expedited review or ask the applicant for additional information to satisfy the guidelines developed under subparagraph (A).

**(d) Classification of pesticides**

**(1) Classification for general use, restricted use, or both**

**(A)** As a part of the registration of a pesticide the Administrator shall classify it as being for general use or for restricted use. If the Administrator determines that some of the uses for which the pesticide is registered should be for general use and that other uses for which it is registered should be for restricted use, the Administrator shall classify it for both general use and restricted use. Pesticide uses may be classified by regulation on the initial classification, and registered pesticides may be classified prior to reregistration. If some of the uses of the pesticide are classified for general use, and other uses are classified for restricted use, the directions relating to its general uses shall be clearly separated and distinguished from those directions relating to its restricted uses. The Administrator may require that its packaging and labeling for restricted uses shall be clearly distinguishable from its packaging and labeling for general uses.

**(B)** If the Administrator determines that the pesticide, when applied in accordance with its directions for use, warnings and cautions and for the uses for which it is registered, or for one or more of such uses, or in accordance with a widespread and commonly recognized practice, will not generally cause unreasonable adverse effects on the environment, the Administrator will classify the pesticide, or the particular use or uses of the pesticide to which the determination applies, for general use.

**(C)** If the Administrator determines that the pesticide, when applied in accordance with its directions for use, warnings and cautions and for the uses for which it is registered, or for one or more of such uses, or in accordance with a widespread and commonly recognized practice, may generally cause, without additional regulatory restrictions,

WESTLAW © 2018 Thomson Reuters. No claim to original U.S. Government Works. 

unreasonable adverse effects on the environment, including injury to the applicator, the Administrator shall classify the pesticide, or the particular use or uses to which the determination applies, for restricted use:

**(i)** If the Administrator classifies a pesticide, or one or more uses of such pesticide, for restricted use because of a determination that the acute dermal or inhalation toxicity of the pesticide presents a hazard to the applicator or other persons, the pesticide shall be applied for any use to which the restricted classification applies only by or under the direct supervision of a certified applicator.

**(ii)** If the Administrator classifies a pesticide, or one or more uses of such pesticide, for restricted use because of a determination that its use without additional regulatory restriction may cause unreasonable adverse effects on the environment, the pesticide shall be applied for any use to which the determination applies only by or under the direct supervision of a certified applicator, or subject to such other restrictions as the Administrator may provide by regulation. Any such regulation shall be reviewable in the appropriate court of appeals upon petition of a person adversely affected filed within 60 days of the publication of the regulation in final form.

**(2) Change in classification**

If the Administrator determines that a change in the classification of any use of a pesticide from general use to restricted use is necessary to prevent unreasonable adverse effects on the environment, the Administrator shall notify the registrant of such pesticide of such determination at least forty-five days before making the change and shall publish the proposed change in the Federal Register. The registrant, or other interested person with the concurrence of the registrant, may seek relief from such determination under section 136d(b) of this title.

**(3) Change in classification from restricted use to general use**

The registrant of any pesticide with one or more uses classified for restricted use may petition the Administrator to change any such classification from restricted to general use. Such petition shall set out the basis for the registrant's position that restricted use classification is unnecessary because classification of the pesticide for general use would not cause unreasonable adverse effects on the environment. The Administrator, within sixty days after receiving such petition, shall notify the registrant whether the petition has been granted or denied. Any denial shall contain an explanation therefor and any such denial shall be subject to judicial review under section 136n of this title.

**(e) Products with same formulation and claims**

Products which have the same formulation, are manufactured by the same person, the labeling of which contains the same claims, and the labels of which bear a designation identifying the product as the same pesticide may be registered as a single pesticide; and additional names and labels shall be added to the registration by supplemental statements.

**(f) Miscellaneous**

**(1) Effect of change of labeling or formulation**

If the labeling or formulation for a pesticide is changed, the registration shall be amended to reflect such change if the Administrator determines that the change will not violate any provision of this subchapter.

**(2) Registration not a defense**

In no event shall registration of an article be construed as a defense for the commission of any offense under this subchapter. As long as no cancellation proceedings are in effect registration of a pesticide shall be prima facie evidence that the pesticide, its labeling and packaging comply with the registration provisions of the subchapter.

**(3) Authority to consult other Federal agencies**

In connection with consideration of any registration or application for registration under this section, the Administrator may consult with any other Federal agency.

**(4) Mixtures of nitrogen stabilizers and fertilizer products**

Any mixture or other combination of--

**(A)** 1 or more nitrogen stabilizers registered under this subchapter; and

**(B)** 1 or more fertilizer products,

shall not be subject to the provisions of this section or sections 136a-1, 136c, 136e, 136m, and 136*o*(a)(2) of this title if the mixture or other combination is accompanied by the labeling required under this subchapter for the nitrogen stabilizer contained in the mixture or other combination, the mixture or combination is mixed or combined in accordance with such labeling, and the mixture or combination does not contain any active ingredient other than the nitrogen stabilizer.

**(g) Registration review**

**(1) General rule**

**(A) Periodic review**

**(i) In general**

The registrations of pesticides are to be periodically reviewed.

**(ii) Regulations**

In accordance with this subparagraph, the Administrator shall by regulation establish a procedure for accomplishing the periodic review of registrations.

 © 2018 Thomson Reuters. No claim to original U.S. Government Works. 

**(iii) Initial registration review**

The Administrator shall complete the registration review of each pesticide or pesticide case, which may be composed of 1 or more active ingredients and the products associated with the active ingredients, not later than the later of--

**(I)** October 1, 2022; or

**(II)** the date that is 15 years after the date on which the first pesticide containing a new active ingredient is registered.

**(iv) Subsequent registration review**

Not later than 15 years after the date on which the initial registration review is completed under clause (iii) and each 15 years thereafter, the Administrator shall complete a subsequent registration review for each pesticide or pesticide case.

**(v) Cancellation**

No registration shall be canceled as a result of the registration review process unless the Administrator follows the procedures and substantive requirements of section 136d of this title.

**(B) Docketing**

**(i) In general**

Subject to clause (ii), after meeting with 1 or more individuals that are not government employees to discuss matters relating to a registration review, the Administrator shall place in the docket minutes of the meeting, a list of attendees, and any documents exchanged at the meeting, not later than the earlier of--

**(I)** the date that is 45 days after the meeting; or

**(II)** the date of issuance of the registration review decision.

**(ii) Protected information**

The Administrator shall identify, but not include in the docket, any confidential business information the disclosure of which is prohibited by section 136h of this title.

**(C) Limitation**

 © 2018 Thomson Reuters. No claim to original U.S. Government Works. 

Nothing in this subsection shall prohibit the Administrator from undertaking any other review of a pesticide pursuant to this subchapter.

**(2) Data**

**(A) Submission required**

The Administrator shall use the authority in subsection (c)(2)(B) to require the submission of data when such data are necessary for a registration review.

**(B) Data submission, compensation, and exemption**

For purposes of this subsection, the provisions of subsections (c)(1), (c)(2)(B), and (c)(2)(D) shall be utilized for and be applicable to any data required for registration review.

**(h) Registration requirements for antimicrobial pesticides**

**(1) Evaluation of process**

To the maximum extent practicable consistent with the degrees of risk presented by an antimicrobial pesticide and the type of review appropriate to evaluate the risks, the Administrator shall identify and evaluate reforms to the antimicrobial registration process that would reduce review periods existing as of August 3, 1996, for antimicrobial pesticide product registration applications and applications for amended registration of antimicrobial pesticide products, including--

**(A)** new antimicrobial active ingredients;

**(B)** new antimicrobial end-use products;

**(C)** substantially similar or identical antimicrobial pesticides; and

**(D)** amendments to antimicrobial pesticide registrations.

**(2) Review time period reduction goal**

Each reform identified under paragraph (1) shall be designed to achieve the goal of reducing the review period following submission of a complete application, consistent with the degree of risk, to a period of not more than--

**(A)** 540 days for a new antimicrobial active ingredient pesticide registration;

**(B)** 270 days for a new antimicrobial use of a registered active ingredient;

WESTLAW © 2018 Thomson Reuters. No claim to original U.S. Government Works. 

**(C)** 120 days for any other new antimicrobial product;

**(D)** 90 days for a substantially similar or identical antimicrobial product;

**(E)** 90 days for an amendment to an antimicrobial registration that does not require scientific review of data; and

**(F)** 120 days for an amendment to an antimicrobial registration that requires scientific review of data and that is not otherwise described in this paragraph.

**(3) Implementation**

**(A) Proposed rulemaking**

**(i) Issuance**

Not later than 270 days after August 3, 1996, the Administrator shall publish in the Federal Register proposed regulations to accelerate and improve the review of antimicrobial pesticide products designed to implement, to the extent practicable, the goals set forth in paragraph (2).

**(ii) Requirements**

Proposed regulations issued under clause (i) shall--

**(I)** define the various classes of antimicrobial use patterns, including household, industrial, and institutional disinfectants and sanitizing pesticides, preservatives, water treatment, and pulp and paper mill additives, and other such products intended to disinfect, sanitize, reduce, or mitigate growth or development of microbiological organisms, or protect inanimate objects, industrial processes or systems, surfaces, water, or other chemical substances from contamination, fouling, or deterioration caused by bacteria, viruses, fungi, protozoa, algae, or slime;

**(II)** differentiate the types of review undertaken for antimicrobial pesticides;

**(III)** conform the degree and type of review to the risks and benefits presented by antimicrobial pesticides and the function of review under this subchapter, considering the use patterns of the product, toxicity, expected exposure, and product type;

**(IV)** ensure that the registration process is sufficient to maintain antimicrobial pesticide efficacy and that antimicrobial pesticide products continue to meet product performance standards and effectiveness levels for each type of label claim made; and

 © 2018 Thomson Reuters. No claim to original U.S. Government Works. 

**(V)** implement effective and reliable deadlines for process management.

**(iii) Comments**

In developing the proposed regulations, the Administrator shall solicit the views from registrants and other affected parties to maximize the effectiveness of the rule development process.

**(B) Final regulations**

**(i) Issuance**

The Administrator shall issue final regulations not later than 240 days after the close of the comment period for the proposed regulations.

**(ii) Failure to meet goal**

If a goal described in paragraph (2) is not met by the final regulations, the Administrator shall identify the goal, explain why the goal was not attained, describe the element of the regulations included instead, and identify future steps to attain the goal.

**(iii) Requirements**

In issuing final regulations, the Administrator shall--

**(I)** consider the establishment of a certification process for regulatory actions involving risks that can be responsibly managed, consistent with the degree of risk, in the most cost-efficient manner;

**(II)** consider the establishment of a certification process by approved laboratories as an adjunct to the review process;

**(III)** use all appropriate and cost-effective review mechanisms, including--

**(aa)** expanded use of notification and non-notification procedures;

**(bb)** revised procedures for application review; and

**(cc)** allocation of appropriate resources to ensure streamlined management of antimicrobial pesticide registrations; and

**(IV)** clarify criteria for determination of the completeness of an application.

 © 2018 Thomson Reuters. No claim to original U.S. Government Works. 

**(C) Expedited review**

This subsection does not affect the requirements or extend the deadlines or review periods contained in subsection (c)(3).

**(D) Alternative review periods**

If the final regulations to carry out this paragraph are not effective 630 days after August 3, 1996, until the final regulations become effective, the review period, beginning on the date of receipt by the Agency of a complete application, shall be--

**(i)** 2 years for a new antimicrobial active ingredient pesticide registration;

**(ii)** 1 year for a new antimicrobial use of a registered active ingredient;

**(iii)** 180 days for any other new antimicrobial product;

**(iv)** 90 days for a substantially similar or identical antimicrobial product;

**(v)** 90 days for an amendment to an antimicrobial registration that does not require scientific review of data; and

**(vi)** 120 days for an amendment to an antimicrobial registration that requires scientific review of data and that is not otherwise described in this subparagraph.

**(E) Wood preservatives**

An application for the registration, or for an amendment to the registration, of a wood preservative product for which a claim of pesticidal activity listed in section 136(mm) of this title is made (regardless of any other pesticidal claim that is made with respect to the product) shall be reviewed by the Administrator within the same period as that established under this paragraph for an antimicrobial pesticide product application, consistent with the degree of risk posed by the use of the wood preservative product, if the application requires the applicant to satisfy the same data requirements as are required to support an application for a wood preservative product that is an antimicrobial pesticide.

**(F) Notification**

**(i) In general**

Subject to clause (iii), the Administrator shall notify an applicant whether an application has been granted or denied not later than the final day of the appropriate review period under this paragraph, unless the applicant and the Administrator agree to a later date.

**(ii) Final decision**

If the Administrator fails to notify an applicant within the period of time required under clause (i), the failure shall be considered an agency action unlawfully withheld or unreasonably delayed for purposes of judicial review under chapter 7 of Title 5.

**(iii) Exemption**

This subparagraph does not apply to an application for an antimicrobial pesticide that is filed under subsection (c)(3)(B) prior to 90 days after August 3, 1996.

**(iv) Limitation**

Notwithstanding clause (ii), the failure of the Administrator to notify an applicant for an amendment to a registration for an antimicrobial pesticide shall not be judicially reviewable in a Federal or State court if the amendment requires scientific review of data within--

**(I)** the time period specified in subparagraph (D)(vi), in the absence of a final regulation under subparagraph (B); or

**(II)** the time period specified in paragraph (2)(F), if adopted in a final regulation under subparagraph (B).

**(4) Annual report**

**(A) Submission**

Beginning on August 3, 1996, and ending on the date that the goals under paragraph (2) are achieved, the Administrator shall, not later than March 1 of each year, prepare and submit an annual report to the Committee on Agriculture of the House of Representatives and the Committee on Agriculture, Nutrition, and Forestry of the Senate.

**(B) Requirements**

A report submitted under subparagraph (A) shall include a description of--

**(i)** measures taken to reduce the backlog of pending registration applications;

**(ii)** progress toward achieving reforms under this subsection; and

**(iii)** recommendations to improve the activities of the Agency pertaining to antimicrobial registrations.

**CREDIT(S)**

(June 25, 1947, c. 125, § 3, as added Pub.L. 92-516, § 2, Oct. 21, 1972, 86 Stat. 979; amended Pub.L. 94-140, § 12, Nov. 28, 1975, 89 Stat. 755; Pub.L. 95-396, §§ 2(a), 3-8, Sept. 30, 1978, 92 Stat. 820, 824-827; Pub.L. 100-532, Title I, §§ 102(b), 103, Title VI, § 601(b)(1), Title VIII, § 801(b), Oct. 25, 1988, 102 Stat. 2667, 2677, 2680; Pub.L. 101-624, Title XIV, § 1492, Nov. 28, 1990, 104 Stat. 3628; Pub.L. 102-237, Title X, § 1006(a)(3), (b)(1), (2), (c), Dec. 13, 1991, 105 Stat. 1894 to 1896; Pub.L. 104-170, Title I, §§ 105(b), 106(b), Title II, §§ 210(b), (c)(1), (d), (e), (f)(2), 222 to 224, 231, 250, Aug. 3, 1996, 110 Stat. 1491, 1494 to 1497, 1499, 1503, 1504, 1508, 1510; Pub.L. 108-199, Div. G, Title V, § 501(b), Jan. 23, 2004, 118 Stat. 419; Pub.L. 110-94, §§ 2, 3, Oct. 9, 2007, 121 Stat. 1000.)

Notes of Decisions (100)

7 U.S.C.A. § 136a, 7 USCA § 136a
Current through P.L. 115-140.

End of Document © 2018 Thomson Reuters. No claim to original U.S. Government Works.

7 U.S.C.A. § 136n

§ 136n. Administrative procedure; judicial review

Currentness

**(a) District court review**

Except as otherwise provided in this subchapter, the refusal of the Administrator to cancel or suspend a registration or to change a classification not following a hearing and other final actions of the Administrator not committed to the discretion of the Administrator by law are judicially reviewable by the district courts of the United States.

**(b) Review by court of appeals**

In the case of actual controversy as to the validity of any order issued by the Administrator following a public hearing, any person who will be adversely affected by such order and who had been a party to the proceedings may obtain judicial review by filing in the United States court of appeals for the circuit wherein such person resides or has a place of business, within 60 days after the entry of such order, a petition praying that the order be set aside in whole or in part. A copy of the petition shall be forthwith transmitted by the clerk of the court to the Administrator or any officer designated by the Administrator for that purpose, and thereupon the Administrator shall file in the court the record of the proceedings on which the Administrator based the Administrator's order, as provided in section 2112 of Title 28. Upon the filing of such petition the court shall have exclusive jurisdiction to affirm or set aside the order complained of in whole or in part. The court shall consider all evidence of record. The order of the Administrator shall be sustained if it is supported by substantial evidence when considered on the record as a whole. The judgment of the court affirming or setting aside, in whole or in part, any order under this section shall be final, subject to review by the Supreme Court of the United States upon certiorari or certification as provided in section 1254 of Title 28. The commencement of proceedings under this section shall not, unless specifically ordered by the court to the contrary, operate as a stay of an order.

**(c) Jurisdiction of district courts**

The district courts of the United States are vested with jurisdiction specifically to enforce, and to prevent and restrain violations of, this subchapter.

**(d) Notice of judgments**

The Administrator shall, by publication in such manner as the Administrator may prescribe, give notice of all judgments entered in actions instituted under the authority of this subchapter.

**CREDIT(S)**

 © 2018 Thomson Reuters. No claim to original U.S. Government Works. 

(June 25, 1947, c. 125, § 16, as added Pub.L. 92-516, § 2, Oct. 21, 1972, 86 Stat. 994; amended Pub.L. 98-620, Title IV, § 402(4)(C), Nov. 8, 1984, 98 Stat. 3357; Pub.L. 100-532, Title VIII, § 801(i), Oct. 25, 1988, 102 Stat. 2682; Pub.L. 102-237, Title X, § 1006(b)(1), (2), (3)(P), Dec. 13, 1991, 105 Stat. 1895, 1896.)

Notes of Decisions (70)

7 U.S.C.A. § 136n, 7 USCA § 136n
Current through P.L. 115-140.

End of Document © 2018 Thomson Reuters. No claim to original U.S. Government Works.

40 C.F.R. § 152.44

# § 152.44 Application for amended registration.

Currentness

(a) Except as provided by § 152.46, any modification in the composition, labeling, or packaging of a registered product must be submitted with an application for amended registration. The applicant must submit the information required by § 152.50, as applicable to the change requested. If an application for amended registration is required, the application must be approved by the Agency before the product, as modified, may legally be distributed or sold.

(b) In its discretion, the Agency may:

(1) Waive the requirement for submission of an application for amended registration;

(2) Require that the applicant certify to the Agency that he has complied with an Agency directive rather than submit an application for amended registration; or

(3) Permit an applicant to modify a registration by notification or non-notification in accordance with § 152.46.

(c) A registrant may at any time submit identical minor labeling amendments affecting a number of products as a single application if no data are required for EPA to approve the amendment (for example, a change in the wording of a storage statement for designated residential use products). A consolidated application must clearly identify the labeling modification(s) to be made (which must be identical for all products included in the application), list the registration number of each product for which the modification is requested, and provide required supporting materials (for example, labeling) for each affected product.

**Credits**

[61 FR 33041, June 26, 1996; 66 FR 64764, Dec. 14, 2001]

SOURCE: 49 FR 30903, Aug. 1, 1984; 50 FR 16234, April 25, 1985; 50 FR 41143, Oct. 9, 1985; 53 FR 15978, May 4, 1988; 53 FR 19114, May 26, 1988; 53 FR 30431, Aug. 12, 1988; 54 FR 11923, March 22, 1989, unless otherwise noted.

AUTHORITY: 7 U.S.C. 136–136y; Subpart U is also issued under 31 U.S.C. 9701.

 © 2018 Thomson Reuters. No claim to original U.S. Government Works. 

Current through March 29, 2018; 83 FR 13620.

End of Document © 2018 Thomson Reuters. No claim to original U.S. Government Works.

40 C.F.R. § 152.112

§ 152.112 Approval of registration under FIFRA sec. 3(c)(5).

Effective: February 10, 2009
Currentness

EPA will approve an application under the criteria of FIFRA sec. 3(c)(5) only if:

(a) The Agency has determined that the application is complete and is accompanied by all materials required by the Act and this part, including, but not limited to, evidence of compliance with subpart E of this part;

(b) The Agency has reviewed all relevant data in the possession of the Agency (see §§ 152.107 and 152.111);

(c) The Agency has determined that no additional data are necessary to make the determinations required by FIFRA sec. 3(c)(5) with respect to the pesticide product which is the subject of the application;

(d) The Agency has determined that the composition of the product is such as to warrant the proposed efficacy claims for it, if efficacy data are required to be submitted for the product by part 158 or part 161 of this chapter, as applicable.

(e) The Agency has determined that the product will perform its intended function without unreasonable adverse effects on the environment, and that, when used in accordance with widespread and commonly recognized practice, the product will not generally cause unreasonable adverse effects on the environment;

(f) The Agency has determined that the product is not misbranded as that term is defined in FIFRA sec. 2(q) and part 156 of this chapter, and its labeling and packaging comply with the applicable requirements of the Act, this part, and parts 156 and 157 of this chapter;

(g) If the proposed labeling bears directions for use on food, animal feed, or food or feed crops, or if the intended use of the pesticide results or may reasonably be expected to result, directly or indirectly, in pesticide residues (including residues of any active or inert ingredient of the product, or of any metabolite or degradation product thereof) in or on food or animal feed, all necessary tolerances, exemptions from the requirement of a tolerance, and food additive regulations have been issued under FFDCA sec. 408, and

 © 2018 Thomson Reuters. No claim to original U.S. Government Works. 

(h) If the product, in addition to being a pesticide, is a drug within the meaning of FFDCA sec. 201(q), the Agency has been notified by the Food and Drug Administration (FDA) that the product complies with any requirements imposed by FDA.

**Credits**

[72 FR 61028, Oct. 26, 2007; 73 FR 75595, Dec. 12, 2008]

SOURCE: 49 FR 30903, Aug. 1, 1984; 50 FR 16234, April 25, 1985; 50 FR 41143, Oct. 9, 1985; 53 FR 15980, May 4, 1988; 53 FR 19114, May 26, 1988; 53 FR 30431, Aug. 12, 1988; 54 FR 11923, March 22, 1989, unless otherwise noted.

AUTHORITY: 7 U.S.C. 136–136y; Subpart U is also issued under 31 U.S.C. 9701.

Notes of Decisions (34)

Current through March 29, 2018; 83 FR 13620.

**End of Document**

© 2018 Thomson Reuters. No claim to original U.S. Government Works.

40 C.F.R. § 155.40

§ 155.40 General.

Effective: February 10, 2009
Currentness

(a) Purpose. These regulations establish procedures for the registration review program required in FIFRA section 3(g). Registration review is the periodic review of a pesticide's registration to ensure that each pesticide registration continues to satisfy the FIFRA standard for registration. Under FIFRA section 3(g), each pesticide is required to be reviewed every 15 years.

(1) Among other things, FIFRA requires that a pesticide generally will not cause unreasonable adverse effects on the environment. Registration review is intended to ensure that each pesticide's registration is based on current scientific and other knowledge regarding the pesticide, including its effects on human health and the environment.

(2) If a product fails to satisfy the FIFRA standard for registration, the product's registration may be subject to cancellation or other remedies under FIFRA.

(b) Applicability. This subpart applies to every pesticide product registered under FIFRA section 3 as well as all pesticide products registered under FIFRA section 24(c). It does not apply to products whose sale or distribution is authorized under FIFRA section 5 or section 18.

(c) Limitations.

(1) At any time, the Agency may undertake any other review of a pesticide under FIFRA, irrespective of the pesticide's past, ongoing, scheduled, or not yet scheduled registration review.

(2) When the Agency determines that new data or information are necessary for a pesticide's registration review, it will require such data under FIFRA section 3(c)(2)(B).

**Credits**
[73 FR 75595, Dec. 12, 2008]

SOURCE: 50 FR 49001, Nov. 27, 1985; 51 FR 17716, May 14, 1986; 71 FR 45732, Aug. 9, 2006; 73 FR 75595, Dec. 12, 2008, unless otherwise noted.

WESTLAW © 2018 Thomson Reuters. No claim to original U.S. Government Works.

AUTHORITY: 7 U.S.C. 136a and 136w.

Current through March 29, 2018; 83 FR 13620.

End of Document © 2018 Thomson Reuters. No claim to original U.S. Government Works.

Code of Federal Regulations
Title 40. Protection of Environment
Chapter I. Environmental Protection Agency (Refs & Annos)
Subchapter E. Pesticide Programs
Part 155. Registration Standards and Registration Review (Refs & Annos)
Subpart C. Registration Review Procedures (Refs & Annos)

40 C.F.R. § 155.42

§ 155.42 Registration review cases.

Effective: October 10, 2006
Currentness

(a) Establishing registration review cases. A registration review case will be composed of one or more active ingredients and all the products containing such ingredient(s). The Agency may group related active ingredients into a registration review case when the active ingredients are so closely related in chemical structure and toxicological profile as to allow common use of some or all required data for hazard assessment.

(1) Existing pesticides. The Agency will assign each pesticide registered on or before the effective date of this regulation to a registration review case.

(2) New pesticides. The Agency will assign each pesticide registered after the effective date of this regulation to an existing registration review case or to a new registration review case.

(3) A pesticide product that contains multiple active ingredients will belong to the registration review cases for each of its active ingredients.

(b) Modifying registration review cases. New data or information may suggest that a registration review case should be modified. The Agency may modify a registration review case in the following ways:

(1) Add a new active ingredient to a registration review case. The Agency may determine that a new active ingredient is chemically and toxicologically similar to active ingredients in an existing registration review case and should be grouped with the ingredients in the existing registration review case.

(2) Split a registration review case into two or more registration review cases. For example, new data or information may suggest that active ingredients in a registration review case are not as similar as previously believed and that they belong in two or more separate registration review cases.

(3) Move an ingredient from one registration review case to another. For example, new data or information might suggest that an ingredient should not be grouped with the other ingredients in the registration review case and that it belongs in a different registration review case.

(4) Merge two or more registration review cases into a single registration review case. For example, new data or information might suggest that the active ingredients in two or more registration review cases should be grouped together for registration review.

(5) Delete an active ingredient from a registration review case. For example, the Agency will remove the ingredient from the case if the registrations of all products containing an active ingredient in a registration review case are canceled.

(c) Closing a registration review case. The Agency will close a registration review case if all products in the case are canceled.

(d) Establishing a baseline date for a registration review case. For the purpose of scheduling registration reviews, the Agency will establish a baseline date for each registration review case. In general, the baseline date will be the date of initial registration of the oldest pesticide product in the case or the date of reregistration, whichever is later. For the purpose of these procedures, the date of reregistration is the date on which the Reregistration Eligibility Decision or Interim Reregistration Decision was signed, whichever date the Agency determines to be more appropriate based on the comprehensiveness of the review.

(1) The Agency generally will not change the baseline date for a registration review case when it modifies a case by adding or deleting ingredients or products.

(2) When the Agency splits a registration review case into two or more cases, the new case(s) generally will have the baseline date of the original registration review case.

(3) When the Agency merges two or more registration review cases into a single case, the Agency generally will use the earliest baseline date as the baseline date for the new case.

(e) Announcing registration review cases and baseline dates. The Agency will maintain a list of registration review cases, including baseline dates, on its website.

SOURCE: 50 FR 49001, Nov. 27, 1985; 51 FR 17716, May 14, 1986; 71 FR 45732, Aug. 9, 2006; 73 FR 75595, Dec. 12, 2008, unless otherwise noted.

AUTHORITY: 7 U.S.C. 136a and 136w.

Current through March 29, 2018; 83 FR 13620.

**End of Document** © 2018 Thomson Reuters. No claim to original U.S. Government Works.

Code of Federal Regulations
Title 40. Protection of Environment
Chapter I. Environmental Protection Agency (Refs & Annos)
Subchapter E. Pesticide Programs
Part 155. Registration Standards and Registration Review (Refs & Annos)
Subpart C. Registration Review Procedures (Refs & Annos)

40 C.F.R. § 155.53

§ 155.53 Conduct of a pesticide's registration review.

Effective: October 10, 2006
Currentness

The Agency will review data and information described in § 155.50(a), (b), and (c) or submitted in response to a Data Call–In notice that it believes should be considered in the pesticide's registration review.

(a) Assess changes since a pesticide's last review. The Agency will assess any changes that may have occurred since the Agency's last registration decision in order to determine the significance of such changes and whether the pesticide still satisfies the FIFRA standard for registration. The Agency will consider whether to conduct a new risk assessment to take into account, among other things, any changes in statutes or regulations, policy, risk assessment procedures or methods, or data requirements. The Agency will consider whether any new data or information on the pesticide, including any data or information submitted under § 155.50 or in response to a Data Call–In notice, warrant conducting a new risk assessment or a new risk/benefit assessment. The Agency will also consider whether any new data or information regarding an individual pesticide product, including any data or information submitted under § 155.50 or in response to a Data Call–In notice, such as data or information about an inert ingredient in the pesticide product or other information or data relating to the composition, labeling or use of the pesticide product, warrant additional review of a pesticide product's registration.

(b) Conduct new assessments as needed.

(1) Active ingredient(s) in the registration review case. If the Agency finds that a new assessment of the pesticide is needed, it will determine whether it can base the new assessment on available data or information, including data or information submitted under § 155.50 or in response to a Data Call–In notice. If sufficient data or information are available, the Agency will conduct the new risk assessment or risk/benefit assessment. If the Agency determines that additional data or information are needed to conduct the review, the Agency will issue a Data Call–In notice under FIFRA section 3(c)(2)(B).

(2) Individual product registrations. If the Agency finds that additional review of an individual product's registration is needed, it will review the pesticide product label, confidential statement of formula, product-specific data, or other pertinent data or information, as appropriate, to determine whether the registration of the individual product meets the FIFRA standard for registration. If the Agency determines that additional data or information are needed to conduct the review, the Agency will issue a Data Call–In notice under FIFRA section 3(c)(2)(B).

(c) Public participation during a pesticide's registration review. The Agency will generally make available for public review and comment a draft risk assessment for a pesticide if a new risk assessment has been conducted. The Agency will publish a notice in the Federal Register announcing the availability of the draft risk assessment and provide a comment period of at least 30 calendar days. The Agency will publish a notice in the Federal Register announcing the availability of a revised risk assessment, an explanation of any changes to the proposed document, and its response to comments. If the revised risk assessment indicates risks of concern, the Agency may, in the notice announcing the availability of the revised risk assessment, provide a comment period of at least 30 calendar days for the public to submit suggestions for mitigating the risk identified in the revised risk assessment.

(1) The Agency might not request comments on a draft risk assessment in cases where the Agency's initial screening of a pesticide indicates that it has low use/usage, affects few if any stakeholders or members of the public, poses low risk, and/or requires little or no risk mitigation. In such cases, the Agency will make a draft risk assessment available for public review and comment when it issues a proposed decision on the registration review case.

(2) If the Agency finds that it is not necessary to conduct a new risk assessment, it will issue a proposed decision on the registration review case as described in § 155.58.

SOURCE: 50 FR 49001, Nov. 27, 1985; 51 FR 17716, May 14, 1986; 71 FR 45732, Aug. 9, 2006; 73 FR 75595, Dec. 12, 2008, unless otherwise noted.

AUTHORITY: 7 U.S.C. 136a and 136w.

Current through March 29, 2018; 83 FR 13620.

End of Document © 2018 Thomson Reuters. No claim to original U.S. Government Works.

Code of Federal Regulations
Title 40. Protection of Environment
Chapter I. Environmental Protection Agency (Refs & Annos)
Subchapter E. Pesticide Programs
Part 158. Data Requirements for Pesticides (Refs & Annos)
Subpart A. General Provisions

40 C.F.R. § 158.75

§ 158.75 Requirements for additional data.

Effective: December 26, 2007
Currentness

The data routinely required by this part may not be sufficient to permit EPA to evaluate every pesticide product. If the information required under this part is not sufficient to evaluate the potential of the product to cause unreasonable adverse effects on man or the environment, additional data requirements will be imposed. However, EPA expects that the information required by this part will be adequate in most cases for an assessment of the properties and effects of the pesticide.

SOURCE: 72 FR 60957, Oct. 26, 2007, unless otherwise noted.

AUTHORITY: 7 U.S.C. 136 - 136y; 21 U.S.C. 346a.

Current through March 29, 2018; 83 FR 13620.

End of Document © 2018 Thomson Reuters. No claim to original U.S. Government Works.

## ADDENDUM OF DECLARATIONS IN SUPPORT OF STANDING

### Table of Contents

Declaration of Joan Bristol ........................................................................ ADD 50

Declaration of LeRoy Gruber........................................................................ ADD 57

Declaration of Gina Trujillo........................................................................ ADD 64

Declaration of Diane Wetzel........................................................................ ADD 68

**UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**

| | |
|---|---|
| NATIONAL FAMILY FARM COALITION, *et al*.,<br><br>*Petitioners*,<br><br>v.<br><br>UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, *et al*.,<br><br>*Respondents*,<br><br>DOW AGROSCIENCES LLC,<br><br>*Respondent-Intervenor*. | No. 17-70810 |
| NATURAL RESOURCES DEFENSE COUNCIL, INC.,<br><br>*Petitioner*,<br><br>v.<br><br>E. SCOTT PRUITT, *et al*.,<br><br>*Respondents*,<br><br>DOW AGROSCIENCES LLC,<br><br>*Respondent-Intervenor*. | No. 17-70817 |

**DECLARATION OF JOAN BRISTOL**

I, Joan Bristol, declare as follows:

1. I am currently a member of NRDC, and have been for about twenty years. I appreciate and support NRDC's work on human health and wildlife protection.

2. I live about an hour west of Philadelphia in a rural area. I'm always concerned about what farmers are putting into their crops because there are many agricultural fields around where I live. We're on an eight-acre farm surrounded by other farms, and we also live right along a run which goes into the Brandywine and Delaware Rivers. In addition, a lot of land around here has been put into conservancy, but they can still be affected by pesticide use on nearby farms.

3. My neighbors' fields are extremely close, less than a football field away from my house. Fields that are directly adjacent to our property have always been used for hay, but around here there are also soy, corn, and wheat fields. I have noticed the farms nearby use a sprayer attached to a big tractor. I tried to find out which pesticides they use but couldn't get an answer.

4. I know that EPA has approved the use of the herbicide Enlist Duo for use on corn, soybeans, and cotton in Pennsylvania, and I understand that Enlist Duo contains glyphosate and 2,4-D, which have been linked to a number of human health harms. I am concerned that Enlist Duo will be applied to the corn and

soybean fields near my property, and especially concerned about cancer and other health risks related to its use.

5. There are fields near our property that are also adjacent to our water supply. We being rural are on our own well water, so even people just spraying their lawns upstream can have an impact on our aquifer. I believe that pesticides from adjacent fields—possibly including Enlist Duo—could get into our water supply, and I don’t have a way of knowing how bad the impact is.

6. We ride horses in our neighbors’ fields three or four times a week for an hour-and-a-half to two hours each time. We also walk twice a day, for about an hour each day. I plan to continue living in my current home, and riding horses and going for walks regularly.

7. I am concerned about being exposed to Enlist Duo since it can travel through the air after being sprayed. If we’re walking around the neighboring farms and a farmer has sprayed recently, I worry about inhaling the spray, and also worry about my dog and other domestic pets in the area which might be impacted.

8. I also worry that residue on my own foods can contain Enlist Duo. I purchase fresh corn from local farmers every week during the summer, and although I try to verify with the famers that they do not use genetically modified seeds or spray pesticides on their crops, I fear that the corn I purchase from them may still contain traces of Enlist Duo that is applied to neighboring fields.

Additionally, I fear that my horses could be eating hay contaminated with Enlist Duo that has drifted through the air or hay grown in soil which has been exposed to the pesticide.

9. I worked in the pharmaceutical industry for over thirty years, and understand that if a new drug is going into the market that people are going to ingest or swallow, it goes through rigorous testing. I believe a pesticide should have to go through that process, too. A doctor must prescribe a drug, and if EPA is "prescribing" Enlist Duo, it should make sure that the pesticide is actually safe for people and the environment. I also think there should be a greater emphasis on measuring and reining in the amount of contamination from chemicals like this.

10. I am also aware that Enlist Duo kills milkweed, the only source of food for the monarch caterpillar, and that glyphosate and 2,4-D have been linked to the decline of monarch populations.

11. As a kid I was always interested in the monarch butterfly, but at that point they weren't imperiled. Back then they were fairly common; I saw them all the time and just considered them as part of nature. I remember going to camp and easily catching butterflies. Now they're much more rare, and when I see them it's such a treat.

12. Five or six years ago I learned about their plight, through organizations like NRDC, World Wildlife Fund, and Friends of the Earth, as well

as through films made by PBS, NRDC, World Wildlife Fund, and National Geographic. There is a group called Natural Habitat Adventures which takes people on tours down to Mexico to watch the Monarch migration. I have not yet participated in the tour because spots fill up quickly and the timing has not worked out so far, but given the opportunity I would do so.

13. Pennsylvania is in the path of the monarch migration, and I try to observe monarchs whenever they're here. Whenever I walk outside I try to keep an eye out for monarchs. My husband and I have milkweed in the garden, and if they have eggs out we try to observe without harming them. I hope to continue watching the monarch migration in future years.

14. Monarchs are beautiful and wonderful insects, and the fact that monarchs have decreased by ninety percent in twenty years is pathetic. We need to do something about that.

15. My understanding of EPA's role in regulating pesticides is that it is required to make sure that they don't pose unreasonable risks to people and the environment. I think EPA should be taking a closer look at the effects of Enlist Duo and scrutinizing the science on what's really happening here. I think EPA should put a hold on this chemical until it can prove it's not unsafe, and in the meantime nobody should be able to use it. I support NRDC's lawsuit to revoke EPA's approval of Enlist Duo. If NRDC were to prevail, my health-related

concerns regarding the risks posed by Enlist Duo would be resolved, and I would be happy to know that monarch butterflies are protected from this threat.

**I declare under penalty of perjury that the foregoing is true and correct.**

Dated: Nov 6, 2017

Joan Bristol

**UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**

| | |
|---|---|
| NATIONAL FAMILY FARM COALITION, *et al*.,<br><br>*Petitioners*,<br><br>v.<br><br>UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, *et al*.,<br><br>*Respondents*,<br><br>DOW AGROSCIENCES LLC,<br><br>*Respondent-Intervenor*. | No. 17-70810 |
| NATURAL RESOURCES DEFENSE COUNCIL, INC.,<br><br>*Petitioner*,<br><br>v.<br><br>E. SCOTT PRUITT, *et al*.,<br><br>*Respondents*,<br><br>DOW AGROSCIENCES LLC,<br><br>*Respondent-Intervenor*. | No. 17-70817 |

**DECLARATION OF LEROY GRUBER**

I, LEROY GRUBER, do hereby affirm and state:

1. I am currently a member of the Natural Resources Defense Council (NRDC) and have been for nearly fifteen years.

2. Among other reasons, I support the NRDC because I am concerned about the impacts of chemicals, including pesticides, on human health and the environment. Reading Rachel Carson's *Silent Spring* was a major turning point in my life, opening my eyes to the detrimental effects of indiscriminate pesticide use on the natural world. Another critical moment in my life occurred when I read *The Limits to Growth*, a report commissioned by the Club of Rome. Through this report, I became convinced that mankind is releasing chemicals into the environment much more quickly than we can neutralize the resulting harmful effects; I firmly believe that we must take action to reverse this trend. I understand that one of NRDC's central purposes is to safeguard human health and the environment from the toxic effects of pesticides and other chemicals, and I strongly support this objective.

3. I worked in the environmental field for thirty-five years. As a Supervising Engineer at the Hamilton County Department of Environmental Services (DES) in Ohio, I became acutely aware of the human health risks, such as cancers and neurodevelopmental harms, posed by exposure to chemicals in the environment. I realized that exposures to even low concentrations of chemicals can

pose serious health risks over time. I also realized that exposures to high concentrations of chemicals, even if briefly, can result in significant health harms. This awareness has heightened my concerns regarding exposure to pesticides, including the herbicide Enlist Duo.

4. Since 2001, I have lived in rural Goshen, Ohio. My property is situated near large agricultural fields planted with soybeans and corn. I am aware that chemicals are sprayed on these fields, even though I do not know the exact identity of those substances. I have seen machines spraying chemicals in the morning, even when winds are blowing at higher speeds.

5. I am aware that EPA recently approved the herbicide Enlist Duo for use on soybeans, corn, and cotton in Ohio. In addition, I am aware that Enlist Duo contains 2,4-D and glyphosate, and that both chemicals are associated with various human health risks. In particular, I understand that glyphosate is a probable human carcinogen. I am concerned that Enlist Duo will be used on the fields next to my property, and that I will be exposed to this herbicide and the health risks it poses, including increased risk of developing cancer.

6. I am particularly concerned about exposure to Enlist Duo through aerial pathways between my property and the adjacent fields. I am aware that pesticides do not end up only on target crops. Rather, they invariably travel off site, including through spray drift and volatilization. Among my other responsibilities at

the Hamilton County DES, I used to model air pollutant emissions. Through this experience, I became aware of the ease with which chemicals can be borne through the air. I am thus especially worried about breathing in Enlist Duo through spray drift and volatilization from the fields next to my home.

7. I had a three-quarter acre pond put on my property after moving in. I stocked the pond with fish. We eat fish we catch from the pond. I am concerned that pesticides and herbicides could settle out from the air into the pond or be carried in by the stream that feeds into the pond. The fish could be contaminated. We also grow vegetables to eat. Rain or fallout on our garden is another concern.

8. When I first moved to Goshen, I obtained drinking water from a cistern on my property. Because I was concerned about pesticide spray drift contaminating my cistern water, however, I spent about $5,000 installing a water line that would allow me to obtain public drinking water from Clermont County. Although I am now less concerned about herbicide exposure through my drinking water, I remain very concerned that I may be exposed to harmful chemicals such as glyphosate and 2,4-D through inhalation of airborne Enlist Duo from the neighboring fields.

9. I avoid using herbicides on my own property, in part because I am concerned about the health risks associated with exposure to these chemicals. However, there is nothing I can do to prevent Enlist Duo from being used on the

fields next to my property, where I intend to stay.

10. I understand that the monarch population has declined by nearly ninety percent over the past twenty years, and that a main cause of this decline is due to the destruction of milkweed, their only food source, by pesticides such as glyphosate and 2,4-D.

11. I love to watch butterflies and even started a collection of photographs of butterflies. When I was in college in downtown Cincinnati many years ago, I used to watch countless monarchs fly by my window. I just don't see as many now.

12. This year I planted milkweed on my property. It's been a personal joy of mine this year and every year to watch the monarch caterpillars, observe them going through the chrysalis stage, release them and have them fly back to Mexico in their final stage. Although there are fewer now, I plan to watch them as long as I have eyes and monarchs continue to go through the area.

13. EPA has a duty to protect the public from the health risks and to ensure the evaluation of environmental consequences posed by exposure to herbicides. I am aware that NRDC has challenged EPA's decision to approve Enlist Duo in part because the agency failed to take into account adequately the health and environmental risks the pesticide poses. I support NRDC's lawsuit to revoke EPA's approval of Enlist Duo. If the court were to invalidate EPA's approval of Enlist Duo, and thereby prevent the herbicide from being used near my home, this

would protect me from the health risks posed by glyphosate and 2,4-D. It would also help protect the annual migration of monarchs through my area and the joy that I attain from watching them.

I declare under penalty of perjury that the foregoing is true and correct.

LeRoy R. Gruber 11/8/2017

LeRoy Gruber Date

**UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**

| | |
|---|---|
| NATIONAL FAMILY FARM COALITION, *et al.*,<br><br>*Petitioners*,<br><br>v.<br><br>UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, *et al.*,<br><br>*Respondents*,<br><br>DOW AGROSCIENCES LLC,<br><br>*Respondent-Intervenor*. | No. 17-70810 |
| NATURAL RESOURCES DEFENSE COUNCIL, INC.,<br><br>*Petitioner*,<br><br>v.<br><br>E. SCOTT PRUITT, *et al.*,<br><br>*Respondents*,<br><br>DOW AGROSCIENCES LLC,<br><br>*Respondent-Intervenor*. | No. 17-70817 |

# DECLARATION OF GINA TRUJILLO

I, GINA TRUJILLO, do hereby affirm and state:

1. I am the Director of Membership for the Natural Resources Defense Council (NRDC). I have served in this position since January 2015.

2. My duties include supervising the preparation of materials that NRDC distributes to members and prospective members. Those materials describe NRDC and identify its mission.

3. NRDC is a membership organization incorporated under the laws of the State of New York. It is recognized as a not-for-profit corporation under section 501(c)(3) of the United States Internal Revenue Code.

4. NRDC's U.S. offices are located in New York, New York; Washington, D.C.; Chicago, Illinois; Bozeman, Montana; San Francisco, California; and Santa Monica, California.

5. NRDC currently has approximately 410,260 members in the United States. There are NRDC members residing in each of the fifty United States and in the District of Columbia.

6. NRDC's mission statement declares that the organization's purpose is "to safeguard the Earth: its people, its plants and animals, and the natural systems on which all life depends." The mission statement goes on to declare that NRDC strives "to protect nature in ways that advance the long-term welfare of present and future generations," and "to help create a new way of life for humankind, one that

can be sustained indefinitely without fouling or depleting the resources that support all life on Earth." Accordingly, protecting human health by preventing pollution ranks among NRDC's top institutional priorities. As set forth in NRDC's statement of priorities: "Toxic chemicals in our environment . . . have been linked to cancer, birth defects and brain impairments. Reducing or eliminating the load of these dangerous chemicals in . . . the air we breathe, the food we eat and the water we drink can help reduce the toll of human disease and suffering."

7. Protecting monarch butterflies from the adverse effects of Enlist Duo is paradigmatic of NRDC's efforts to safeguard wildlife. NRDC has dedicated significant resources to defending animal species against toxic chemicals, including pesticides.

8. Protecting human health from the adverse effects of Enlist Duo likewise exemplifies NRDC's work. NRDC has sought for years to limit human exposure to toxics.

I declare under penalty of perjury that the foregoing is true and correct.

Gina Trujillo 1/2/18

Gina Trujillo

Date

**UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**

| | | |
|---|---|---|
| NATIONAL FAMILY FARM COALITION, *et al*.,<br><br>*Petitioners*,<br><br>v.<br><br>UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, *et al*.,<br><br>*Respondents*,<br><br>DOW AGROSCIENCES LLC,<br><br>*Respondent-Intervenor*. | ) | No. 17-70810 |
| NATURAL RESOURCES DEFENSE COUNCIL, INC.,<br><br>*Petitioner*,<br><br>v.<br><br>E. SCOTT PRUITT, *et al*.,<br><br>*Respondents*,<br><br>DOW AGROSCIENCES LLC,<br><br>*Respondent-Intervenor*. | ) | No. 17-70817 |

**DECLARATION OF DIANE WETZEL**

I, DIANE WETZEL, do hereby affirm and state:

1. I am currently a member of the Natural Resources Defense Council (NRDC) and have been for approximately thirteen years.

2. My support for NRDC stems from my love of the outdoors and my profound concerns about environmental degradation and its impacts on both human beings and other creatures. Being a member of NRDC helps me give voice to my environmental concerns. I support NRDC's efforts to safeguard human health and wildlife, including monarch butterflies, from the harms arising from rampant pesticide use in America.

3. I have lived in West Lafayette, Indiana, for the past twenty years, and plan to continue to live there for the foreseeable future. My home is located in a heavily agricultural area, where corn and soybeans are the dominant crops. There is a field directly behind my home, where corn and soybeans are planted in alternating years. Half a mile down the road in the opposite direction, there is another field planted with corn and soybeans. In addition, the entire area starting from about two miles north of my home is devoted to agriculture, with corn and soybean fields stretching as far as the eye can see.

4. I have seen pesticides being sprayed on the corn and soybean fields near my home. Sometimes, vehicles with large, liquid-filled tanks, bearing "flammable" warning labels, use mechanical arms to spray chemicals on the fields.

I have also seen crop-dusting planes spraying pesticides on the fields two miles from my home.

5. I am aware that EPA has approved the use of the herbicide Enlist Duo for use on corn, soybeans, and cotton in Indiana. I understand that Enlist Duo contains the chemicals 2,4-D and glyphosate. I am aware that 2,4-D has been linked to thyroid disorders and other human health harms, and that glyphosate is probably carcinogenic to humans, according to recent findings. I am concerned that Enlist Duo will be applied to the corn and soybean fields near my property, and that my health will be detrimentally affected by both inhalation of 2,4-D or glyphosate and consumption of drinking water contaminated with 2,4-D or glyphosate.

6. I am worried about direct exposure to Enlist Duo through volatilization and spray drift. When the weather permits, I go running or biking through the countryside three or four times a week. Doing so takes me past the corn and soybean fields near my home. I have breathed in pesticides on some of these excursions. While biking, for example, I have smelled heavy chemical odors emanating from the fields. I am therefore concerned that I will inhale Enlist Duo used in the fields around my property during my regular runs and bike rides.

7. I am also concerned about being exposed to Enlist Duo through my drinking water. Although my drinking water comes from the West Lafayette

municipal water system rather than local wells, testing has revealed high levels of the pesticide atrazine in that system. This indicates to me that pesticides enter, and are not fully removed from, the municipal water supply from which I obtain my drinking water. Accordingly, I fear that Enlist Duo, like atrazine, will contaminate the water that I drink.

8. I plan to continue living in my current home for at least the next five years, and perhaps indefinitely. My husband is Director of Convocations at Purdue University, and given the job market, it is unlikely that he will take a post elsewhere in the near future. In addition, maintaining an active lifestyle is important to me, so I plan to continue running and biking in the area around my home three to four times a week. EPA's approval of Enlist Duo for use in my area thus threatens to expose me to 2,4-D and glyphosate, thereby putting my health at risk.

9. In addition, I am concerned that my sixteen-year-old son—who breathes the same air and drinks the same water as I do—will suffer health harms through exposure to Enlist Duo. I understand that there has been an increase in thyroid disorders among children in my area in recent years. One of my friend's doctors informed her, for example, that he has observed more and more cases of thyroid conditions among local children. I am aware that 2,4-D has been implicated in thyroid and developmental disorders. I am also aware that children

are particularly vulnerable to the health risks posed by 2,4-D. I am therefore especially concerned that my son will be harmed by inhalation of Enlist Duo applied to the corn and soybean fields in my area, and by drinking municipal water contaminated with 2,4-D.

10. My misgivings about EPA's approval of Enlist Duo are grounded not only in my concerns about my health and the health of my family, but also in my concerns about the fate of the monarch butterfly migration. I am aware that glyphosate and 2,4-D have contributed significantly to the decline of the monarch butterfly. I have personally observed this decline in the area where I live.

11. I first became interested in monarch butterflies about ten years ago, when my son was in kindergarten. As part of a school project, my son was given a monarch cocoon. I bought my son books on monarchs and, upon reading about the butterflies myself, became fascinated by these complex and lovely creatures. I have since followed news on monarchs in newspapers and magazines, and on the websites of organizations including NRDC.

12. I moved to West Lafayette in the summer of 1997. During my initial years here, I saw approximately twenty monarchs every spring and summer. I saw the butterflies while running or biking near my home and sometimes on my own property. Seeing these marvelous insects filled me with delight. About fourteen years ago, however, I began noticing a decline in the monarchs migrating through

my area. Although the decline took place gradually, it has reached a point where I see only one monarch—or no monarchs at all—each year.

13. When I first moved to West Lafayette, milkweed grew naturally along the road at the edge of my property, but there was nothing growing on my lot. I have since tried to attract monarchs to my property by planting a variety of flowering, butterfly-attractive plants to complement the milkweed that grows on nearby roads. For example, I have planted purple asters, sedum, black-eyed susans, lavender, basil, and thyme. Despite these efforts, I see almost no monarchs now. On the rare occasion that I do spot a monarch, I am filled with excitement. However, the sighting also fills me with anxiety, as I fear that it will be my last. Witnessing the monarch's decline has filled me with great sadness, diminishing the fulfillment I derive from observing these marvelous creatures. It has also lessened my pleasure in gardening, insofar as the plants that I cultivate fail to attract and benefit the butterflies.

14. I understand that glyphosate and 2,4-D both destroy milkweed, which is the only food source for monarch caterpillars. I am also aware that glyphosate is an ingredient in "Roundup Ready" pesticides. When I drive through the area around my home, I see signs bearing the "Roundup Ready" logo along the corn and soybean fields. I am concerned that EPA's approval of Enlist Duo for use in Indiana will increase the amount of glyphosate used in West Lafayette, further

decimating the milkweed upon which monarchs depend. That Enlist Duo might also increase the amount of 2,4-D used in my area troubles me further. I have been dismayed by the significant decline in the number of monarchs migrating through my area, a loss that has taken away from my enjoyment of living in the countryside.

15. EPA should do more to protect both humans and monarchs from the adverse effects of Enlist Duo. I am aware that NRDC has challenged EPA's decision to register Enlist Duo, based on harms to both human health and monarch butterflies. I support NRDC's lawsuit to nullify EPA's approval of Enlist Duo. If the court were to invalidate EPA's approval of Enlist Duo, this would safeguard the air I breathe and the water I drink from contamination by 2,4-D and glyphosate, thereby protecting me from the health risks linked to exposure to these chemicals; it would likewise protect my son from these same health risks. Revocation of Enlist Duo's registration would also limit further expansion in the use of 2,4-D and glyphosate in West Lafayette, protecting the fragile migration of monarchs through my area and the satisfaction I derive from observing the butterflies.

I declare under penalty of perjury that the foregoing is true and correct.

Diane Wetzel ______________________ Dec. 12, 2017 ______________

Diane Wetzel

Date